**MINNESOTA LIFE INSURANCE COMPANY, Petitioner,**

v.

**Elia L. VASQUEZ, Respondent.**

No. 04–0477.

Supreme Court of Texas.

Argued April 13, 2005.

Decided April 7, 2006.

Rehearing Denied June 9, 2006.

Stephen D. Howen, Mark T. Davenport, Figari & Davenport, L.L.P., Dallas, for Petitioner.

Van Huseman, Alan Clifton Gordon, Paul Dodson, Huseman & Pletcher, Corpus Christi, for Respondent.

Justice BRISTER delivered the opinion of the Court.

The mortgage insurer in this bad-faith case took six months to pay off the insured's mortgage because (1) the death certificate made coverage unclear and (2) the hospital took four months to produce the remaining medical records. Finding the insurer had knowingly engaged in an unfair or deceptive act, a jury awarded extra-contractual damages on top of the $41,000 mortgage the insurer paid after suit was filed. Applying a statutory cap, the trial court entered a reduced judgment for additional damages, mental anguish, and attorney's fees, and the court of appeals affirmed.

Unquestionably, the insurance company here might have done better. But when insurers are negligent, the Texas Insurance Code does not grant policyholders extra-contractual damages. Instead, such damages are reserved for cases in which an insurer knew its actions were false, deceptive, or unfair. There is no such evidence here.

Claims for extra-contractual damages should not be a routine addition to every breach-of-policy case. The Constitution requires "[e]xacting appellate review" of damages that punish rather than compensate.[1] As the lower courts failed to enforce that standard here, we reverse.

1. *State Farm Mut. Auto. Ins. Co. v. Campbell,*   538 U.S. 408, 418, 123 S.Ct. 1513, 155

## I

In November 1998, Minnesota Life issued a Mortgage Accidental Death Insurance policy to Joe and Elia Vasquez, promising to pay their home mortgage in the event either died due to an accident. In June 2000, Joe Vasquez became ill, was hospitalized, suffered a seizure, and lapsed into a coma. Twelve days later, he emerged from the coma and was transferred to a hospital room. Later that day, while no one else was present, he apparently fell, hit his head, and died.

On October 6, 2000, Elia Vasquez filed a claim with Minnesota Life requesting payment of the balance due on her mortgage (about $41,000) and submitted copies of the death certificate and autopsy report. After reviewing the documents, Minnesota Life sought advice from a medical consultant as to whether Mr. Vasquez's death resulted from an accident "independently of all other causes," as required by the policy. The consultant advised that he needed to see the relevant medical records.

To obtain the records, Minnesota Life employed PMSI, a vendor specializing in that line. PMSI requested the medical records several times without success. Minnesota Life kept Ms. Vasquez informed of these activities, though notices were occasionally sent to her old address.

On January 25, 2001, Ms. Vasquez's attorney sent Minnesota Life a $110,000 demand letter for violations of the Texas Insurance Code. Minnesota Life's efforts to obtain the records continued to flounder until it finally sent its own demand letter to the hospital.

The records were at last produced on March 25, 2001. As it turned out, they disclosed no additional details about Mr. Vasquez's death. Deciding there was no other way to determine exactly what occurred, Minnesota Life paid the remaining balance on the Vasquez's mortgage on March 28th.

Two days later, Minnesota Life was served with Ms. Vasquez's suit. The insurer removed the case to federal court on diversity grounds. The federal court remanded, as the petition alleged that "the amount sought under this lawsuit is less than $75,000." [2]

At trial two years later, the jury found that Minnesota Life knowingly violated the Insurance Code and that Ms. Vasquez was entitled to $60,000 for mental anguish, $250,000 in additional damages (reduced to $120,000 in the judgment),[3] and $37,000 in attorneys' fees. The trial court granted Ms. Vasquez a post-trial amendment to plead for this amount—substantially more than the $75,000 she had previously alleged. The court of appeals affirmed. We granted Minnesota Life's petition for review, and now reverse.

## II

The first (and dispositive) issue in this appeal is whether there is any evidence that Minnesota Life knowingly committed an unfair settlement practice. As the claim was paid shortly after suit was filed, no breach of contract claim remains. Further, the insurer admits it owes interest at the rate of 18 per cent for failing to pay the claim within 60 days.[4]

L.Ed.2d 585 (2003) (requiring that courts review reprehensibility of the defendant's misconduct, disparity between harm suffered and damages awarded, and civil penalties imposed in comparable cases).

**2.** *See* 28 U.S.C. § 1332.

**3.** *See* TEX. BUS. & COMM. CODE § 17.50(b)(1).

**4.** *See* TEX. INS. CODE art. 21.55, § 3(f) (currently codified as §§ 542.056(d), 542.058, & 542.060).

But the insurer contests the awards for mental anguish and additional damages, both of which are recoverable only if the Insurance Code violation was committed knowingly.[5] Minnesota Life contends there was no evidence that it had actual awareness of the falsity, deception, or unfairness of its handling of this claim.[6]

Two unfair settlement practices were alleged and submitted to the jury:

- failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;[7] and,
- failing within a reasonable time to affirm or deny coverage of a claim to a policyholder.[8]

The court of appeals found some evidence of a knowing violation of the former, and thus did not reach the latter. We address each in turn.

### A

■ The court of appeals found some evidence that Minnesota Life failed to pay this claim after coverage had become reasonably clear. But it reached that conclusion by "[c]onsidering only the evidence offered in support of the finding."[9] As we recently noted in *City of Keller v. Wilson*, using this standard in insurance bad-faith cases is problematic, as coverage will almost always be reasonably clear if reviewing courts must disregard all evidence that it was unclear.[10] Instead, appellate courts for some time have looked at all the evidence in such cases,[11] crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.[12] Applying that standard, we agree with the insurer that there was no evidence that it failed to settle this claim after coverage had become reasonably clear.

■ It is undisputed that all Minnesota Life ever knew about the cause of death here was what appeared in the autopsy report and death certificate.[13] Those documents described an "accident" in which Joe Vasquez "[f]ell and hit back of head" [sic]. But both documents listed his cause of death as "[s]eizure disorder with encephalopathy followed by blunt force trauma to the head."

The policy here provided coverage if "death results directly *and independently of all other causes* ... from an accidental injury" (emphasis added).[14] As the documents here listed both a seizure disorder

5. TEX. INS. CODE, art. 21.21, § 16(b)(1) (currently codified as § 541.152(b)); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 436 (Tex.1995).

6. TEX. INS. CODE art. 21.21, § 2(c) (currently codified as § 541.002(1)).

7. *Id.* § 4(10)(a)(ii) (currently codified as § 541.060(a)(2)(A)).

8. *Id.* § 4(10)(a)(v)(A) (currently codified as § 541.060(a)(4)).

9. *Minnesota Life Ins. Co. v. Vasquez*, 133 S.W.3d 320, 328 (Tex.App.-Corpus Christi 2004, pet. granted).

10. 168 S.W.3d 802, 817–18 (Tex.2005).

11. *Id.* at 818 n. 3.

12. *Id.* at 807.

13. While Minnesota Life might have discovered more had it been more diligent (as discussed below), there is no evidence that it actually knew anything more before the claim was paid.

14. Specifically, the policy stated:

Death by accidental injury as used in this policy means that your death results directly and independently of all other causes from an accidental drowning or from an accidental injury which was unintended, unexpected, and unforeseen.

and a blow to the head as the cause of death, they unquestionably disclosed an "accidental injury," but not one that was the sole cause of death "independently of all other causes."

Similarly, the policy excluded payment of benefits if "death results from or is caused directly *or indirectly* by ... bodily or mental infirmity, illness or disease" (emphasis added).[15] Again, by listing both a seizure and an accident, the documents suggested that a bodily infirmity or illness had contributed at least indirectly to the death.

Though somewhat cryptic, these official documents were all the insurer had. Both listed a seizure disorder and a blunt force as a single cause of death. One of these (the blow to the head) was an accidental injury, the other (the seizure disorder) was not. While the documents said only that the head injury "followed" the seizure disorder, listing both as a single cause reasonably suggested the two were related and that both played a role in the death. Nothing in these documents suggested the insured's seizure disorder was so remotely connected with the subsequent injury that it could not constitute legal cause.[16] Nor did either suggest that all forces generated by any seizure "had come to rest" before the blow to the head,[17] or merely placed the insured in the wrong place at the wrong time.[18]

As these documents were all the insurer had, if coverage was not reasonably clear from them, it was not reasonably clear at all. Since the policy covered death caused independently of any bodily infirmity, it was not reasonably clear here. Accordingly, we hold there is no evidence that the insurer failed to pay the claim after coverage had become reasonably clear.

### B

■ The jury was also instructed that an insurer violates the Insurance Code "by failing within a reasonable time (A) to affirm or deny coverage of a claim to a policyholder or (B) submit a reservation of rights to a policyholder."[19] On appeal, Minnesota Life asserts that this provision applies only to liability insurers, a question we have noted but not reached.[20] But as Minnesota Life concedes it had a duty to affirm or deny the Vasquez claim within a reasonable time and did not object to the charge at trial, we review the insurer's legal sufficiency challenge according to the charge as given.[21]

The Insurance Code contains several penalties for delayed investigation and payment of claims. State law requires an

---

15. Specifically, the policy stated:
    In no event will we pay the accidental death benefit if your *death results from or is caused directly or indirectly by any of the following*:
    \*     \*     \*     \*     \*     \*
    (3) bodily or mental infirmity, illness or disease; ...

16. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775–76 (Tex.1995).

17. *Id.* at 776 (quoting *Bell v. Campbell,* 434 S.W.2d 117, 120 (Tex.1968)).

18. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 472 (Tex.1991).

19. *See* Tex. Ins. Code art. 21.21, § 4(10)(a)(v) (currently codified as § 541.060(a)(4)).

20. *See N. County Mut. Ins. Co. v. Davalos,* 140 S.W.3d 685, 691 (Tex.2004).

21. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 618–19 (Tex.2004) ("In assessing the evidence, we assume that the portions of the charge just quoted, because they were given without objection, correctly state the law."); *see also Edward D. Jones & Co. v. Fletcher,* 975 S.W.2d 539, 543 (Tex.1998) (holding no-duty objection preserved without objection to charge).

insurer to accept or reject a claim within 15 business days after receiving "all items, statements, and forms required," a deadline the insurer may extend an additional 45 days by notifying the insured of the reasons why it needs additional time.[22] Failure to meet these deadlines entitles the insured to 18 per cent interest and reasonable attorney's fees.[23]

But the Code also defines failing to affirm or deny coverage within a reasonable time as an "unfair settlement practice." [24] Standing alone, such a claim entitles an insured only to actual damages and attorney's fees. But if the conduct is committed knowingly, mental anguish and additional damages are available.

Minnesota Life concedes that it failed to pay the claim within a reasonable time after Ms. Vasquez sent everything requested from her. After receiving the death certificate and autopsy report on October 6, 2000, Minnesota Life or its agents took the following steps:

| Days elapsed | Action |
| --- | --- |
| 6 | Requested medical review |
| 13 | Medical review indicated medical records might help confirm cause of death |
| 27 | Retained vendor to obtain records |
| 46 | Vendor requested records |
| 110 | Vendor told authorization needed |
| 131 | Attorney hired to obtain records |
| 167 | Attorney demand letter for records |
| 171 | Records received |
| 174 | Claim paid |

At trial, the insurer presented undisputed evidence that the hospital from which the records were requested was slow to return calls and unresponsive to repeated requests. According to what the insurer was told by its vendor, there had been more than a dozen efforts to contact the hospital and obtain delivery. The head of the hospital's medical records division confirmed that, during the period here, four-month delays like this one were not infrequent. As the court of appeals noted, "Minnesota Life was stymied by the hospital records department during its investigation, and it had no control over this delay." [25]

An expert for Ms. Vasquez testified that he had never had this much trouble obtaining medical records, but he had no knowledge of, or experience with, this particular hospital. While he suggested other avenues by which the records might have been obtained,[26] there was no evidence Minnesota Life knew that any of those avenues would have resulted in a complete set of the records any earlier.

There was plenty of evidence of unaccountable delays. The insurer did not ask a vendor to obtain the records until 27 days after receiving the proof of loss, and the vendor did not make a request for them until 19 days later. Even though the hospital initially said that no authorization from Ms. Vasquez was needed, the insurer might easily have sent one anyway and avoided later delays.

But what is missing from the record is any evidence that Minnesota Life was aware that its protracted efforts to obtain the medical records were false, deceptive, or unfair to Ms. Vasquez. There is noth-

---

**22.** See Tex. Ins. Code art. 21.55, § 3 (currently codified as § 542.056). Minnesota Life's internal policies are even shorter, requiring that claims be accepted or rejected in 10 days.

**23.** See id. § 6 (currently codified as § 542.060).

**24.** See Tex. Ins. Code art. 21.21, § 4(10)(a)(v) (currently codified as § 541.060(a)(4)).

**25.** 133 S.W.3d at 330.

**26.** Evidence at trial showed that the medical examiner had a copy of the medical chart, but there was no evidence the insurer ever knew that was the case. And while the insurer might have interviewed the doctors involved, there was no evidence they would have been willing or able to recall anything helpful about their former patient.

ing to suggest that it intentionally prolonged the investigation or that its efforts were a sham to avoid paying what it admits was a relatively small claim. There is no evidence it gave Ms. Vasquez false reasons for the delay or that it knew Ms. Vasquez was suffering mental anguish in the interim.[27] Even Ms. Vasquez's expert admitted at trial that he would not have paid her claim based on the autopsy report and death certificate alone. As it turned out, the medical records added nothing new to those documents, but it is undisputed that no one knew that at the time.

█ We agree that when coverage is not reasonably clear, an insurer cannot sit on its hands or draw out an investigation to keep things that way. Under the Insurance Code, an insurer that fails to pay claims promptly must pay for actual damages it causes as a result. But payments beyond that cannot be based on negligence or hindsight; there must be evidence that the insurer was actually aware that it was handling the claim in a way that was false, deceptive, or unfair. As there is no such evidence here, the lower courts erred in awarding extra-contractual damages.

Accordingly, we reverse the court of appeal's judgment and remand to the trial court for entry of judgment in accordance with this opinion.

---

**27.** Evidence at trial established that Ms. Vasquez had received $25,000 from another insurance policy on her husband's life, and thus could pay her bills while her claim against Minnesota Life was pending.