Affirmed as Modified and Memorandum Opinion filed July 20, 2006








Affirmed as Modified and Memorandum Opinion filed July 20,
2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00478-CV

____________

 

MOMENTUM MOTOR CARS, LTD. D/B/A
MOMENTUM SAAB AND TAVAX, INC. D/B/A DISCOUNT CAR CLINIC, Appellants

 

V.

 

KARL AND SUE HAUENSTEIN, Appellees

 

 

 



 

On Appeal from the 240th
District Court

Fort Bend County, Texas

Trial Court Cause No. 113,113

 



 

M E M O R A N D U M   O P I N I O N








After the successive failures of two replacement
transmissions in their Saab automobile, Karl and Sue Hauenstein sued Momentum
Motor Cars, Ltd. d/b/a Momentum Saab (the provider of the two transmissions),
Tavax Inc. d/b/a Discount Car Clinic (the installer of the two transmissions);
and Saab Cars USA (the manufacturer of the two transmissions).  Among other
claims, the Hauensteins alleged violations of the Texas Deceptive Trade
Practices Act, principally regarding the time delays experienced in obtaining
replacement transmissions.  A jury found that Discount Car Clinic knowingly
engaged in false, misleading, or deceptive acts or practices, that Discount and
Momentum knowingly engaged in unconscionable conduct or courses of conduct, and
that the Hauensteins suffered damages, including mental anguish damages.  The
jury also found that Saab Cars USA was not liable to the Hauensteins for any of
the alleged conduct.  The trial court entered judgment in keeping with the jury
findings.

On appeal, both Momentum and Discount contend that the
evidence is legally insufficient to support the conclusions that (1) they acted
unconscionably toward the Hauensteins, (2) they committed such acts knowingly,
and (3) the Hauensteins suffered mental anguish.  We modify the judgment to
remove the award of mental anguish damages and affirm the judgment as modified.[1]

I.  Background

A brief time line of relevant events follows:

$                  
1996:  Karl Hauenstein bought a used Saab sedan.

$                  
1/8/99:  When the transmission failed, Hauenstein took the vehicle
to Discount.[2]

$                  
1/16/99:  Discount returned the vehicle to Hauenstein after
installing a new Saab transmission.  The replacement transmission was obtained
from Saab Cars USA (the manufacturer) through Momentum (a local Saab
dealership).








$                  
7/18/99:  The new transmission developed problems, and Hauenstein
had the vehicle towed back to Discount.

$                  
About
one week later, Discount told Hauenstein that there was a dispute between it
and Momentum regarding whether Discount had used the proper transmission fluid
when it installed the new transmission.

$                  
8/2/99:  Hauenstein wrote a demand letter to Momentum.

$                  
8/6/99:  Hauenstein wrote a complaint letter to the Texas Attorney
General=s Office.

$                  
9/7/99:  Momentum responded to the Attorney General complaint,
asserting that Discount had used the wrong fluid but Saab had nonetheless
agreed to provide a replacement transmission.

$                  
9/15/99:  Discount responded to the Attorney General, asserting
that it had used the proper transmission fluid, that Momentum=s Ainauspicious fluid
assessment@ and indifference had caused the delays, and that a
new transmission had been received for installation in Hauenstein=s vehicle.

$                  
9/16/99:  Hauenstein notified the Attorney General that the
transmission issue had still not been resolved.

$                  
9/27/99: Discount returned Hauenstein=s vehicle to him
with a new transmission installed.

$                  
10/15/99:  The new transmission failed, and Hauenstein returned the
vehicle to Discount.

$                  
October 1999:  Discount told Hauenstein that Momentum had refused to
provide another replacement transmission.

$                  
October or November 1999:  The Hauensteins retained counsel.








$                  
1/5/00:  The Hauensteins= attorney wrote
demand letters to both Discount and Momentum.

$                  
1/13/00:  Momentum=s attorney stated in a letter to the
Hauensteins= attorney that a transmission had been available for
Discount to pick up since November.

$                  
1/24/00:  The Hauensteins= attorney wrote a
letter to Discount=s attorney regarding the availability of
the transmission.

$                  
3/30/00:  The Hauensteins filed the present lawsuit.

$                  
7/12/00:  Discount=s attorney wrote a letter to Momentum=s attorney.

$                  
7/28/00:  Momentum=s attorney responded and offered a
replacement transmission.

$                  
August 2000:  Discount=s attorney accepted Momentum=s offer of a
replacement transmission.

$                  
9/9/00:  The Hauensteins= vehicle was
returned with a new transmission.  They sold the vehicle shortly thereafter.

When the original transmission failed, the vehicle was
repaired and returned in about eight days.  After the first replacement
transmission failed, seventy-seven days elapsed before a second replacement
transmission was installed and the vehicle returned.  After the second
replacement transmission failed, it took about 324 days for a third replacement
transmission to be installed and the vehicle returned.  Although each
replacement transmission came with a one year warranty from the manufacturer,
Hauenstein testified that because he never received a written warranty from
Discount, he did not know that he could have taken the vehicle to any dealer to
have the warranty honored.








After the first replacement transmission failed, Hauenstein
was told that there was a dispute between Discount and Momentum regarding
whether Discount had used the correct fluid in the transmission.  There are
various references in the record to testing the transmission fluid from the
first replacement transmission.  Fred Tavicoli, Discount=s owner, stated
that he sent a sample of the fluid to Momentum for testing.  John Sokol, a
service manager for Saab Cars USA, testified that he was told by someone at
Momentum that the fluid was to be tested.  Later, Sokol was informed that the
fluid had been tested and that the results were inconclusive.  Sokol stated
that in his twenty-four years of automotive experience, he had no recollection
of an outside mechanic=s ever having used the incorrect fluid in
a Saab transmission.  A letter from Discount to the Attorney General states
that Momentum initially refused to test the fluid despite having asserted that
the wrong fluid was used.  Discount further stated in the letter that when
Momentum eventually agreed to test the fluid, the testing revealed that the
correct fluid had been used.  However, the record contains neither
documentation that such testing was ever performed nor the results of such
testing.

After the second replacement transmission failed, a
Discount service advisor told Hauenstein that Momentum had said that it would
not honor the warranty unless Momentum had installed the prior transmission. 
According to the service advisor, Momentum therefore required Discount to tow
the vehicle to Momentum.  When Hauenstein subsequently called Momentum, a
Momentum representative told him that Momentum had not requested that the car
be towed to them; rather, Discount had Adumped@ the vehicle on
Momentum, and Hauenstein would have to pay towing and storage fees if the
vehicle was not removed.  Tavicoli testified that Discount kept the vehicle
inside while it was awaiting a new transmission, but Hauenstein testified that
he frequently observed the vehicle left outside at Discount.

Tavicoli further testified that Momentum refused to provide
another replacement transmission.  He said that he did not receive notice of a
transmission being made available in November 1999, as claimed in the letter
from Momentum=s counsel dated January 13, 2000.  He also stated that
even after he was informed in January that Momentum had a transmission
available, Momentum still refused to give him the transmission.








Tavicoli additionally testified that Hauenstein was very
upset when he learned that he could not get another transmission after the
October 15, 1999, failure.  Hauenstein testified regarding the vehicle=s importance to
him; it was the car that he drove on a Aday to day@ basis.  He said
that he bought it because of Saab=s reputation for
reliability, and he intended to keep it for a long time.  During the
seventy-seven days that it took to get the second replacement transmission
installed, Hauenstein depended on his wife to drive him everywhere he needed to
go, including to and from work.  He stated that he was angry at Momentum and
Discount during each period of delay.  He said that he felt Aback to square one@ and was horribly
frustrated, and that things Aseemed to be spinning out of control.@  Hauenstein said
that he contacted Discount frequently, calling every day or at least every
other day for a time.  He stated that this was a very bad period in his life,
and he lost a lot of sleep.  He had increasing feelings of helplessness, was Aextremely unhappy,@ felt a lot of
hostility and other negative emotions, and said that Ait was very
unpleasant to be me.@  He further said that the episode
affected his relationships with his wife and his sons and that they argued a
lot.  However, Hauenstein ultimately acknowledged that Aanguish@ was Aa bit strong@ to use in
describing his mental state.

Sue Hauenstein testified that Karl loved the vehicle, was
very attached to it, and planned to keep it for awhile.  She stated that the
seventy-seven days waiting for the second replacement transmission were very
emotional and frustrating.  She said that her husband changed during that time
and things became tense; everyone was upset.  She had to plan her day around
taking her husband to work, and he hated being an inconvenience.  She said that
she felt helpless, as if she and her husband Adid not count.@  She stated that
she had trouble sleeping and that her irritable bowel syndrome became more
problematic than usual.  When her irritable bowel syndrome Akicked in,@ she felt like her
Alife was over.@

Regarding the period after the second replacement
transmission failed, Sue Hauenstein said that the situation was even worse. 
She became afraid that they were never going to see the vehicle again, and her
irritable bowel syndrome was worse than usual.








A jury found that Discount Car Clinic engaged in false,
misleading, or deceptive acts or practices and that Discount and Momentum
engaged in unconscionable acts or courses of conduct.  The jury also found that
Saab Cars USA was not liable to the Hauensteins for any of the alleged
conduct.  The jury awarded actual damages to the Hauensteins, including
$9,357.31 in non-mental anguish damages, $5,000 for Karl Hauenstein=s mental anguish
and $2,500 for Sue Hauenstein=s mental anguish.  The jury further found
that Discount and Momentum knowingly engaged in the conduct, and on this basis,
it assessed an additional $7,500 in damages.  The jury determined that Discount
was 60 percent responsible for the Hauensteins= damages, and that
Momentum was 40 percent responsible.  The jury also awarded attorney=s fees to the
Hauensteins.  Based on the jury=s verdict and its calculation of
prejudgment interest, the trial court entered judgment ordering Discount to pay
the Hauensteins $17,395.89 in damages plus postBjudgment interest
and attorney=s fees, and ordering Momentum to pay the Hauensteins
$11,597.22 plus postBjudgment interest and attorney=s fees.

II.  Standard of Review

Appellants challenge the legal sufficiency of the evidence
on several of the jury findings.  The test for legal sufficiency is whether the
evidence at trial Awould enable reasonable and fair‑minded
people to reach the verdict under review.@  City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  In making this
determination, we must view the evidence in the light most favorable to the
verdict, crediting any favorable evidence if a reasonable fact‑finder
could and disregarding any contrary evidence unless a reasonable fact‑finder
could not.  Id. at 821‑22, 827.  We may sustain a legal
sufficiency challenge only when (1) the record discloses the complete absence
of a vital fact, (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (3) the only
evidence offered to prove a vital fact is no more than a mere scintilla, or (4)
the evidence conclusively establishes the opposite of a vital fact.  Id.
at 810.  Because appellees did not make any objections to the language in the
charge, we review their legal sufficiency challenges based on the charge as
given.  See Minn. Life Ins. Co. v. Vasquez, 49 Tex. Sup. Ct. J. 498,
501, 2006 WL 889724, at *3 (Tex. April 7, 2006).

 








III.  Unconscionability

In their respective first issues, Momentum and Discount
each contend that the evidence was legally insufficient to support the jury=s finding that
they engaged in an unconscionable action or course of action toward the
Hauensteins.  Section 17.50(a)(3) of the Deceptive Trade Practices Act provides
that a consumer may recover actual damages for Aany unconscionable
action or course of action@ that is the producing cause of damages.  Tex. Bus. & Com. Code Ann. ' 17.50(a)(3)
(Vernon Supp. 2005).  The DTPA defines an Aunconscionable
action or course of action@ as Aan act or
practice, which . . . takes advantage of the lack of knowledge, ability,
experience, or capacity of the consumer to a grossly unfair degree.@  Id. ' 17.45(5).  The
instructions accompanying jury charge Question 9 tracked this statutory
language.  Caselaw further informs us that unconscionability under the DTPA is
an objective standard for which scienter is irrelevant.  Ins. Co. of N. Am.
v. Morris, 981 S.W.2d 667, 677 (Tex. 1998).  To prove an unconscionable
action or course of action, a plaintiff must show that the defendant took
advantage of the plaintiff=s lack of knowledge and that the resulting
unfairness was glaringly noticeable, flagrant, complete, and unmitigated.  Bradford
v. Vento, 48 S.W.3d 749, 760 (Tex. 2001).  The relevant inquiry examines
the entire transaction but not the defendant=s intent.  Chastain
v. Koonce, 700 S.W.2d 579, 583 (Tex. 1985).

A.  Momentum








During the events underlying this lawsuit, Momentum was a
Saab dealership.  The Hauensteins indicated in their testimony that they are
not particularly knowledgeable about automobiles or auto repair.  After the
first replacement transmission failed, Momentum initially refused to honor the
warranty because it claimed that Discount had used the wrong transmission
fluid.  Despite this claim, a letter from Discount stated that Momentum at
first refused to even test the fluid.  Although there was some testimonial
evidence that the fluid was eventually tested, the jury, in its role as
fact-finder, was free to disregard that testimony.  See City of Keller,
168 S.W.3d at 819-20.  There is no documentary evidence that such testing ever
occurred.  A Momentum representative apparently told John Sokol, Saab=s area service
manager, that the testing was inconclusive.  Tavicoli, however, testified that
the testing confirmed that he had used the correct fluid.  Sokol testified that
in his twenty-four years of automotive experience, he had no recollection of an
outside mechanic=s ever having put the incorrect fluid in a
Saab transmission.  Sokol also stated that he never saw the results of any
testing.  Ultimately, Sokol told Momentum to provide a new replacement
transmission for the Haeunstein=s vehicle.  In a letter to the Attorney
General, Discount stated that the delay was due to Momentum=s indifference and
Ainauspicious fluid
assessment.@  On September 7, 1999, Momentum wrote to the Attorney
General that Saab had agreed to replace the transmission; however, it was
another twenty days before Hauenstein=s car was
returned.  Although it only took seven days to obtain and install the first
replacement transmission, it took a total of seventy-seven days to obtain and
install the second replacement transmission.

After the second replacement transmission encountered
problems in October 1999, Momentum again initially refused to honor the
warranty and again asserted that there was a fluid-related problem.  There is
no documentary evidence to support this claim.  Hauenstein testified that a
Discount service advisor told him that Momentum required that the vehicle be
towed to Momentum.  When Hauenstein subsequently called Momentum, a Momentum
representative told Hauenstein that he would have to pay towing and storage
fees if the vehicle was not removed.  In a letter dated January 13, 2000,
Momentum=s attorney
asserted that a transmission had been available for Discount to pick up since
November; however, Tavicoli testified that he did not receive notice of a
transmission=s being available until January 2000.  Even then,
according to Tavicoli, Momentum would still not let him have the transmission. 
Despite evidence that both Hauenstein and Discount made frequent contact with
Momentum, it wasn=t until after an exchange of letters
between counsel that a third replacement transmission was finally installed in
the Hauensteins= vehicle on September 9, 2000.  All told,
it took about 324 days for the third replacement transmission to be obtained
and installed.








The evidence was legally sufficient for the jury to
conclude that Momentum engaged in an unconscionable course of action by
asserting the fluid issues and using its superior knowledge, ability,
experience, and capacity in an attempt to avoid honoring the warranty or at
least to delay honoring the warranty on both occasions.  See generally Brown
v. Galleria Area Ford, Inc., 752 S.W.2d 114, 116-17 (Tex. 1988) (holding evidence
was legally sufficient to support unconscionability finding where plaintiffs= truck became Asuspended in limbo@ during change in
ownership of dealership); Aetna Cas. & Sur. Co. v. Garza, 906 S.W.2d 543, 553B54 (Tex. App.CSan Antonio 1995, writ dism=d by agr.)
(holding evidence was legally sufficient to support unconscionability finding
where insurance company delayed providing insured with copy of policy and
delayed making payments during lengthy investigation of claim); Centroplex
Ford, Inc. v. Kirby, 736 S.W.2d 261, 263-64 (Tex. App.CAustin 1987, no writ)
(holding evidence was legally sufficient to support unconscionability finding
where repairs took six months after plaintiff was told they would take six
weeks).[3] 
Accordingly, we overrule Momentum=s first issue.

B.  Discount

Discount is a chain of auto repair shops.  Hauenstein
testified that Discount advertised as a specialist on Swedish automobiles. 
Discount never provided Hauenstein with a copy of any of the one-year
warranties associated with the replacement transmissions.  Hauenstein testified
that he was therefore unaware that he could return the vehicle to any
dealership to have the warranty honored and did not have to deal with Discount
or Momentum.  Although Hauenstein testified that he had frequent contact with
Discount regarding a second replacement transmission, it was not until
Hauenstein filed a complaint with the Texas Attorney General that a new
transmission was installed.  Still, it took seventy-seven days for the second
replacement transmission to be installed.








After the second transmission encountered problems,
Discount told Hauenstein that Momentum was refusing to provide another
replacement.  Momentum was, apparently, again alleging that Discount had
improperly installed the transmission.  There is scant evidence in the record,
however, that Discount was doing anything to convince Momentum that the
transmission was properly installed.  This was despite the fact that Hauenstein
testified he had frequent contact with Discount regarding his vehicle.  After
the Hauensteins obtained counsel and counsel wrote demand letters to both
companies, Momentum=s attorney stated in a letter dated
January 13, 2000, that a replacement transmission had been available since
November.  Even after January 2000, when Tavicoli admits that he became aware
that a transmission was available, he failed to contact Momentum=s attorney as
suggested by the Hauensteins= counsel.  Indeed, it was not until almost
four months after the Hauensteins filed their lawsuit that Discount=s attorney wrote a
letter to Momentum=s attorney regarding the replacement
transmission.  Tavicoli acknowledged that he did not do anything to obtain a
transmission between the time the lawsuit was filed in March 2000 until July
2000.  There was also an indication in the record that he had neglected to
deliver the failed transmission to Momentum, which was apparently a
prerequisite for obtaining a replacement under the warranty.  A total of over
ten months elapsed between the time Momentum=s attorney claimed
a transmission had been available and the time Discount actually obtained and
installed the transmission.

At one point, a Discount service advisor told Hauenstein
that Momentum had required that the vehicle be towed to Momentum.  A Momentum
representative indicated to Hauenstein that this was a fabrication and that
Discount had Adumped@ the vehicle on Momentum.  Altogether, it
took about 324 days for the third replacement transmission to be obtained and
installed.








The evidence was sufficient for the jury to conclude that
Discount engaged in an unconscionable act or course of action by failing to
provide Hauenstein with his warranty documents, misleading him regarding
Momentum=s position, and failing
to timely obtain and install the replacement transmissions.  See generally
Brown, 752 S.W.2d at 116-17; Garza, 906 S.W.2d at 553B54; Centroplex
Ford, 736 S.W.2d at 263-64.  Accordingly, we overrule Discount=s first issue.

IV.  Knowingly

In their respective second issues, Momentum and Discount
each contend that the evidence is legally insufficient to prove that they
knowingly committed the unconscionable conduct.  The instructions accompanying
Question 12 stated:  A>Knowingly= means actual
awareness, at the time of the conduct, of the falsity, deception, or unfairness
of the conduct in question . . . .  Actual awareness may be inferred where
objective manifestations indicate that a person acted with actual awareness.@  See TEX.
BUS. & COM. CODE ANN. ' 17.45(9) (Vernon 2002) (using
substantially similar language).  The Texas Supreme Court has further explained
that A>[a]ctual awareness= does not mean
merely that a person knows what he is doing; rather, it means that a person
knows that what he is doing is false, deceptive, or unfair.  In other words, a
person must think to himself at some point, >Yes, I know this
is false, deceptive, or unfair to him, but I=m going to do it
anyway.=@  St. Paul Surplus
Lines Ins. Co. v. Dal‑Worth Tank Co., 974 S.W.2d 51, 53‑54 (Tex.
1998).  Direct evidence is not required to show that a DTPA violation was
undertaken knowingly.  See Gomez v. Diaz, 57 S.W.3d 573, 579 (Tex. App.CCorpus Christi 2001,
no pet.).

Clearly, representatives of both Momentum and Discount knew
that the Hauensteins did not have use of their vehicle during the waiting
periods for the second and third replacement transmissions.  They also knew
that it was their failure to provide or obtain the replacement transmissions
that caused the periods of delay.  The jury could certainly have concluded from
these facts and the facts discussed above regarding unconscionability that
Momentum and Discount had actual awareness, at the time of the conduct, of the
falsity, deception, or unfairness of the conduct.








Both Momentum and Discount were involved in correspondence
and other communication with the Attorney General=s Office, the
Hauensteins, and the Hauensteins= counsel. 
Specifically regarding Momentum, Sokol=s testimony that
in his twenty-four years of experience he had no recollection of an outside
mechanic=s ever having used
the incorrect fluid in a Saab transmission suggests that a Saab dealership,
such as Momentum, would have known this to be an unlikely scenario. 
Nevertheless, Momentum pursued this argument not only in regard to the failure
of the second replacement transmission but also in regard to the failure of the
third replacement transmission.  Furthermore, while Momentum=s attorney
asserted that a transmission had been available since November, Tavicoli
testified that he did not receive notice of a transmission being available
until January 2000, and even then, Momentum would still not let him have the
transmission.  Certainly, the jury could have concluded that Momentum knew it
had claimed that a replacement was available but then failed to provide it as
claimed.

Similarly, the jury could have concluded that Discount knew
that it did not give Hauenstein his warranty documents, that it was not doing
much to obtain replacement transmissions, and that it failed to give the second
replacement transmission to Momentum after it failed.  There was also evidence
that Discount Adumped@ the vehicle on Momentum and fabricated a
story that Momentum required that the vehicle be towed to it.  Tavicoli
testified at one point that he knew the delays were very frustrating to
Hauenstein and that Hauenstein had a right to be upset.

Thus, the evidence was legally sufficient to support the
jury=s finding that
Momentum and Discount knowingly committed the unconscionable conduct.  We
overrule Momentum=s and Discount=s respective
second issues.

V.  Mental Anguish








In their respective third issues, Momentum and Discount
each challenge the legal sufficiency of the evidence to support the jury=s finding that the
Hauensteins suffered compensable mental anguish.  The jury charge did not
define Amental anguish.@  AMental@ is commonly
defined as A[o]f or relating to the mind; intellectual.@  The Am. heritage Dictionary 786 (2d
College Ed. 1991).  AAnguish@ is commonly
defined as A[a]n agonizing physical or mental pain; torment.@  Id. at
110.  In line with these definitions, the Texas Supreme Court has stated that
in order to support an award for mental anguish damages there must be evidence
of a high degree of mental pain and distress that is more than mere worry,
anxiety, vexation, embarrassment, or anger.  Parkway Co. v. Woodruff,
901 S.W.2d 434, 444 (Tex. 1995).  An award will survive a legal sufficiency
challenge when there is direct evidence of the nature, duration, and severity
of the mental anguish, establishing a substantial disruption in the plaintiffs= daily routine.  Id. 
The supreme court has also emphasized that courts should Aclosely scrutinize@ awards of mental
anguish damages.  Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 54
(Tex. 1997).

The most direct evidence of a person=s mental state
comes from that person=s own testimony.  At trial, Hauenstein was
asked: ADid you feel
anguish about this whole transaction?@  He responded: AAnguish is a bit
strong word [sic], but I felt let down.  I felt disappointed.@  Feeling let down
and being disappointed do not constitute mental anguish.  Although not
necessarily dispositive in a legal sufficiency review, Hauenstein=s comments
regarding anguish color the remainder of his and his wife=s testimony
regarding the impact of events on his mental state.

Tavicoli testified that Hauenstein seemed very upset about
the situation.  Hauenstein himself testified that he felt bad that his wife had
to drive him places, that he was angry at Momentum and Discount, that he felt Aback to square
one,@ that he was horribly
frustrated, and that things Aseemed to be spinning out of control.@  He testified
that this was a very bad period in his life, and he lost a lot of sleep.  He
experienced increasing feelings of helplessness as well as hostility and other
negative emotions.  He said that Ait was very
unpleasant to be me.@  He stated that when the second
transmission failed, he was Aextremely unhappy.@  He further said
that the episode affected his relationships with his wife and his sons and that
they argued a lot.








Sue Hauenstein testified that the first period of delay was
very emotional and frustrating.  She said that her husband changed during that
time, things became tense, and everyone in the family was upset.  She said that
she felt helpless, that she had trouble sleeping, and that her irritable bowel
syndrome became more problematic.  She said that when her irritable bowel
syndrome Akicked in,@ it felt like her Alife was over.@

Although the conduct of Momentum and Discount clearly had
some negative effects on the Hauensteins, we find that the evidence does not
demonstrate a high degree of mental pain and distress that is more than mere
worry, anxiety, vexation, embarrassment, or anger.  See Parkway Co., 901
S.W.2d
at 444; see also GTE Mobilnet of S. Tex. Ltd. P=ship v. Pascouet, 61 S.W.3d 599, 619 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied) (holding that evidence was insufficient to support mental anguish
damages award where plaintiffs testified that the defendant=s conduct caused
them anger, stress, distress, anguish, disappointment, lost sleep, worry, and
embarrassment).  Although Hauenstein testified regarding a substantial
disruption in his daily routine, it is clear that the disruption came from the
loss of use of the vehicle and not from any associated mental anguish. 
Accordingly, we sustain Momentum=s and Discount=s third issues.

Conclusion

In summary, we find that the evidence was legally
sufficient to support the jury=s findings that both Momentum and Discount
knowingly engaged in unconscionable conduct toward the Hauensteins.  However,
we find that the evidence was legally insufficient to support the award of
mental anguish damages.

We modify the judgment to remove the award of mental
anguish damages and affirm the judgment as modified.

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed July 20, 2006.

Panel consists of
Chief Justice Hedges and Justices Yates and Guzman.









[1]  As mentioned, the jury found that Saab Cars USA was
not liable to the Hauensteins for any of the alleged conduct.  Consequently,
Saab Cars USA did not file an appeal in this case.  Although the Hauensteins
filed a notice of appeal in the trial court, they did not raise any grounds of
error in their brief, and they did not identify Saab Cars USA as a party to
this appeal either in their brief or in their notice of appeal.  Accordingly,
Saab Cars USA is not a party to this appeal.





[2]  Because most of the activity underlying this case
involved Karl Hauenstein and not Sue Hauenstein, we will use the name AHauenstein@ by
itself to refer to Karl.  When appropriate, Sue Hauenstein will be referred to
by her full name.





[3]  Momentum additionally argues that the jury=s finding that Momentum engaged in unconscionable
conduct conflicts with its finding that Momentum did not engage in false,
misleading or deceptive acts or practices.  We disagree.  The instructions
accompanying Question 8 in the charge defined a Afalse, misleading, or deceptive act or practice@ specifically to include representations concerning
the sale and quality of the transmissions.  The evidence of unconscionable
conduct discussed in the text above did not involve representations concerning
the sale and quality of the transmissions themselves, but involved other
conduct relating mostly to the time delay in replacing the failed
transmissions.