**TEXAS MUTUAL INSURANCE COMPANY, Appellant/Cross–Appellee,**

v.

**P. Lance MORRIS, Appellee/Cross–Appellant.**

**No. 14–06–00651–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

June 4, 2009.

Murry B. Cohen, J. Stephen Barrick, Houston, for appellant/cross-appellee.

Byron C. Keeling, Michael P. Doyle, Houston, for appellee/cross-appellant.

Panel consists of Justices ANDERSON and FROST.*

### SUBSTITUTE OPINION ON REHEARING

KEM THOMPSON FROST, Justice.

The court issued a unanimous opinion in this case on August 26, 2008. Appellant

---

* Retired Justice Wanda McKee Fowler left the bench after the original opinion issued and did not participate on rehearing.

Texas Mutual Insurance Company moved for rehearing. After receiving a response from appellee P. Lance Morris, the court grants the motion for rehearing in part, withdraws the earlier opinion, vacates the earlier judgment, and issues this substitute opinion and new judgment in their place.

## I. INTRODUCTION

A workers' compensation carrier appeals from a final judgment in favor of a workers' compensation claimant. In six issues, the carrier contends that (1) the evidence is legally insufficient to sustain the jury's finding that the carrier engaged in unfair or deceptive acts or practices in violation of the Texas Insurance Code, (2) the evidence is legally insufficient to sustain the jury's finding that the carrier did so knowingly, (3) the evidence is legally insufficient to support the award of damages for loss of credit reputation, (4) the evidence is legally insufficient to support the award of mental-anguish damages, (5) the trial court erred in submitting broad-form liability questions containing both valid and invalid theories of liability, and (6) the judgment cannot be sustained on the alternative claim of breach of the duty of good faith and fair dealing because no such claim is recognized in the context of a workers' compensation claim. In a cross-appeal, the claimant requests that this court modify the trial court's judgment to increase the award of additional damages for the carrier's knowing violation of the Texas Insurance Code.

We conclude that the evidence is legally sufficient to support the jury's findings that the carrier engaged in unfair or deceptive acts or practices in violation of the Texas Insurance Code and that it did so knowingly. We also conclude that legally sufficient evidence supports the award of mental-anguish damages, and that no *Cas-*

*teel*[1] problem requires reversal. However, we conclude that no evidence supports the award for loss of credit reputation. We further conclude that the claimant's cross-appeal lacks merit. We therefore modify the judgment to delete that portion awarding the claimant damages for loss of credit reputation and to reduce the additional damages accordingly. Further, because we are reducing the actual damages awarded to the claimant, we also reverse the portion of the judgment awarding attorney's fees, and remand this case for retrial of that issue and for the recalculation of pre-judgment and post-judgment interest. We affirm the remainder of the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/cross-appellant P. Lance Morris brought this suit against appellant/cross-appellee Texas Mutual Insurance Company, alleging that the company acted in bad faith and violated the Texas Insurance Code because it failed to properly investigate Morris's claim for workers' compensation benefits, and that it delayed paying workers' compensation benefits due him. Morris alleged that, on June 12, 2000, while working for the Justin Volunteer Fire Department he received an on-the-job injury to his spine (the "2000 Injury"). Then, in March 2003, Morris required emergency treatment for his back injury. According to Morris, Texas Mutual initially promised to pay for surgery on his back, but only days after the surgery, the company reneged on this promise. Morris alleged that the requested treatment for his injury was reasonable and necessary, but Texas Mutual delayed and denied payment for the previously pre-authorized medical treatment, with significant adverse consequences to him. Morris

1. *See Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000).

also alleged that the Texas Workers' Compensation Commission (hereinafter the "Commission")[2] adjudicated that Texas Mutual wrongfully denied his claim for benefits. Morris claimed that Texas Mutual violated the Texas Insurance Code, breached its common-law duty of good faith and fair dealing, and violated the Deceptive Trade Practices Act ("DTPA").[3]

Texas Mutual answered the suit and later amended its answer to add a counterclaim for fraud. In the counterclaim, Texas Mutual alleged that Morris strained or sprained his back in 1998; two years before the 2000 Injury, and that he falsely represented to the Commission that he did not have a pre-existing back injury. Texas Mutual claimed that Morris knew this representation was false when he made it, and that Texas Mutual relied upon it and was injured by having to pay for benefits that would not have been due if the extent of Morris's back problems had been disclosed fully.

In the March 2006 trial, the jury returned a 10–2 verdict in Morris's favor on his claims for common-law bad faith and statutory violations. The jury awarded Morris $50,000 for past mental anguish; $25,000 for past damage to his credit reputation; $50,000 for future damage to his credit reputation; and $120,000 for attorney's fees. The jury also awarded Morris $500,000 in additional damages because it found that Texas Mutual knowingly violated the Texas Insurance Code. The jury declined to find that Texas Mutual acted with malice or that Morris defrauded Texas Mutual. On May 18, 2006, the trial court signed a final judgment for Morris, awarding the amounts found by the jury,

except for the $500,000 in additional damages, which the trial court reduced to $250,000. On appeal, Texas Mutual raises six issues, and Morris raises one issue in his cross-appeal.

### III. ISSUES PRESENTED BY THE CARRIER

In its first four issues, Texas Mutual contends the evidence is legally insufficient to support:

- the jury's finding that Texas Mutual engaged in unfair or deceptive acts or practices in violation of the Texas Insurance Code,
- the jury's finding that Texas Mutual violated the Texas Insurance Code knowingly, and
- the jury's damage awards for mental anguish and lost credit reputation.

In its fifth issue, Texas Mutual contends that the trial court erroneously instructed the jury on both valid and invalid theories of liability. In its sixth issue, Texas Mutual contends that no cognizable claim exists for breach of the duty of good faith and fair dealing against a workers' compensation carrier, or alternatively, any such claim should be abolished.

### A. Legal Sufficiency of Evidence Supporting Jury's Finding that the Carrier Engaged in Unfair or Deceptive Acts or Practices in Violation of the Texas Insurance Code

In its first issue, Texas Mutual contends that no evidence supports the jury's finding that Texas Mutual engaged in unfair or deceptive acts or practices in violation of the Texas Insurance Code because no evi-

---

**2.** The Commission is now known as the Texas Department of Insurance, Division of Workers' Compensation. *See* TEX. LAB.CODE ANN § 402.001(b) (Vernon 2006). We refer to that authority as it existed during the period relevant to this case.

**3.** Morris also sued Joy Rodgers, Texas Mutual's adjuster on his claim, but she is not a party to this appeal.

dence shows that it misrepresented the policy or failed to explain the basis for the dispute, and no evidence shows that it knew or should have known that coverage was reasonably clear. Texas Mutual also contends that the evidence conclusively shows that it had a reasonable basis to dispute Morris's claim. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *See id.* at 822. The jury is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

### 1. Jury's Liability Finding Regarding the Texas Insurance Code

The judgment against Texas Mutual is predicated on the jury's affirmative answer to Question 2. In that question, the jury was asked whether Texas Mutual engaged in any one or more of eight unfair or deceptive acts or practices under Texas Insurance Code sections 541.060 and 541.061.[4] In propounding that question the court instructed the jury to consider the following ways in which an insurer could engage in an unfair or deceptive act:

Making any misrepresentation of an insurance policy by:

a. making an untrue statement of fact;[5] or

b. failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made;[6] or

c. making any statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact;[7] or

d. failing to disclose any matter required by law to be disclosed;[8] or

Engaging in any of the following unfair settlement practices with respect to a claim by an insured or beneficiary:

a. misrepresenting to a claimant a material fact or policy provision relating to coverage at issue;[9] or

b. *failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;*[10] or

c. failing to provide promptly to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim;[11] or

---

4. Unless otherwise specified, all statutory references in this opinion are to the Texas Insurance Code.

5. *See* TEX. INS.CODE ANN. § 541.061(1) (Vernon 2009).

6. *See id.* § 541.061(2).

7. *See id.* § 541.061(3).

8. *See id.* § 541.061(5).

9. *See id.* § 541.060(a)(1) (Vernon 2009).

10. (Emphasis added). *See id.* § 541.060(a)(2).

11. *See id.* § 541.060(a)(3).

d. *refusing to pay a claim without conducting a reasonable investigation with respect to the claim.*[12]

On appeal, Texas Mutual contends that no evidence supports any of the acts listed.

As a preliminary matter, we first address the proper legal standard against which to measure the legal sufficiency of the evidence. Texas Mutual argues that, under Texas law, (1) proof that a workers' compensation carrier refused to pay a claim without conducting a reasonable investigation is not sufficient to support liability against the carrier for violating the Insurance Code, and (2) the claimant also must prove a failure by the carrier to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the carrier's liability has become reasonably clear.[13]

For ease of reference, we refer to the first element as "no reasonable investigation" and the second element as "reasonably clear liability."[14] Morris, on the other hand, asserts that liability may be affirmed based only upon legally sufficient evidence that Texas Mutual failed to conduct a reasonable investigation.[15]

■ For the purposes of our analysis, we presume, without deciding, that Texas Mutual's characterization of Texas law is correct. Nonetheless, Question 2 did not charge the jury on this law; rather, it allowed the jury to find an Insurance Code violation based only on a finding of no reasonable investigation.[16] No party objected to Question 2's failure to charge the jury on what Texas Mutual argues on appeal is the correct legal standard, and no

---

12. (Emphasis added). *See id.* § 541.060(a)(7).

13. Relying on *Provident American Insurance Company v. Castañeda,* Texas Mutual asserts that, generally, a finding that an insurer failed to conduct a reasonable investigation is not a sufficient basis for an insurer's liability under section 541.060 because a finding that the insurer's liability had become reasonably clear is usually necessary for an insurer to be liable for an Insurance Code violation. *See* 988 S.W.2d 189, 197–98 (Tex.1998); *see also* Tex. Ins.Code Ann. § 541.060(a)(2)(A), 541.060(a)(7). Texas Mutual states that there is an exception to this general rule when the insurer's failure to conduct a reasonable investigation causes damages separate and apart from the damages that would have resulted from a wrongful denial of the claim. *See Castañeda,* 988 S.W.2d at 198–99. Nonetheless, Texas Mutual asserts that the Supreme Court of Texas abolished this exception in the workers' compensation context by its decision in *American Motorists Insurance Company v. Fodge. See* 63 S.W.3d 801, 804 (Tex.2001). Consistent with this argument, on appeal Texas Mutual does not argue that there is legally insufficient evidence that its alleged failure to conduct a reasonable investigation caused damages separate and apart from the damages that would have resulted

from a wrongful denial of Morris's claim. *See Castañeda,* 988 S.W.2d at 198–99.

14. The "reasonably clear liability" and "no reasonable investigation" portions of Question 2 are highlighted in the quotation from this question above.

15. *See* Tex Ins.Code Ann. § 541.060(a)(7) (providing that an insurer engages in an unfair settlement practice by "refusing to pay a claim without conducting a reasonable investigation with respect to the claim").

16. The structure and language of Question 2 are substantially similar to Pattern Jury Charge ("PJC") 102.18. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* 88 (2003 ed.). The unambiguous language of PJC 102.18 allows a recovery based only upon a finding of no reasonable investigation. *See id.* In addition, a comment to PJC 102.18 states that "each subpart used from PJC 102.18 must be followed by the word *or,* because a finding of any one of the acts or practices defined in the instructions would support recovery." *See id.* at 89; *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* 96–7 (2008 ed.).

party requested that the jury be charged under this legal standard.[17] Therefore, this court reviews the sufficiency of the evidence under the charge submitted to the jury (allowing liability to be based on a finding of either no reasonable investigation or reasonably clear liability), even if the charge did not correctly state Texas law. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (holding that court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard); *Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.,* 201 S.W.3d 272, 283–86 (Tex. App.-Houston [14th Dist.] 2006, no. pet.) (reviewing sufficiency of evidence based on unobjected-to jury instruction and rejecting various arguments based on different legal standards). Accordingly, if there is legally sufficient evidence of either no reasonable investigation or reasonably clear liability, there is legally sufficient evidence to support the jury's answer to Question 2.

**2. Evidence of "No Reasonable Investigation" and "Reasonably Clear Liability."**

■ Texas Mutual asserts that the evidence is legally insufficient to support either a finding of "no reasonable investigation" or a finding of "reasonably clear liability." Texas Mutual contends that its records showed that Morris had a minor injury that resolved in 2000 and a new, and more severe, injury in 2003, caused by an unrelated incident. Therefore, Texas Mutual asserts, the evidence conclusively shows that the company had a reasonable basis to deny or delay paying

Morris's workers' compensation claim based on the 2000 Injury. Texas Mutual claims that it had a reasonable basis to question whether the back strain Morris sustained in connection with the 2000 Injury was a cause of his need for back surgery in April 2003. According to Texas Mutual, its records showed that Morris suffered only a minor injury for which he received one month of chiropractic treatment; he returned to work without restrictions after missing only one shift. In addition, Texas Mutual claims, the medical records available from Morris's surgeon in April 2003 reflected that Morris's injury requiring surgery occurred when he slipped or fell off a fire truck, not while lifting a patient out of a ditch as occurred on June 12, 2000. Thus, because Texas Mutual's records indicated a minor injury while lifting a patient out of a ditch, that had fully resolved in 2000, and a "new and more severe injury in 2003 cause[d] by a different incident," Texas Mutual believed it had grounds to dispute whether Morris's surgery was connected with the 2000 Injury.

The question before this court is whether legally sufficient evidence exists to show "no reasonable investigation" or to show "reasonably clear liability." The following evidence presented to the jury supports a finding as to both items.

*The 2000 Injury and the Surgery*

On June 12, 2000, while working for the Justin Volunteer Fire Department, Morris hurt his back when he lifted a victim of a motor-vehicle accident out of a ditch. The fire department reported the injury to its workers' compensation carrier, Texas Mutual, which accepted the claim.[18] Morris

---

17. Morris asserts in his appellate brief that this court should examine the sufficiency of the evidence in light of the charge submitted to the jury.

18. Texas Mutual was then known as the Texas Workers' Compensation Insurance Fund.

visited a chiropractor, Dr. Waldrop, the day he was injured. Dr. Waldrop's initial medical report to the Commission noted that Morris was injured when he "lifted a patient and felt sharp shooting pain in the lumbar portion of his spine." The doctor's clinical assessment indicated that Morris had "palpable muscle spasms at the L–4–L–5 level of his spine." Morris received several chiropractic treatments from Dr. Waldrop over the next two weeks. After that, Morris had periodic appointments with Dr. Waldrop over the next two-and-a-half years. Morris missed only a brief period of work as a result of the 2000 Injury.

In February 2003, Morris married and moved from Justin to Sugar Land. After the move, Morris began seeing another chiropractor, Dr. King. At some point, Morris began experiencing increasing pain in his back, and on March 23, 2003, Morris went to the emergency room at Methodist Hospital in Sugar Land. The hospital referred Morris to a neurosurgeon, Dr. Charles Neblett, who diagnosed Morris with a herniated disc.[19] Dr. Neblett requested preauthorization from Texas Mutual to perform an "L4–5 L5–S1 lumbar laminectomy." Texas Mutual granted the request for pre-authorization on April 1, 2003. Surgery was performed the next day.

### The Initial Inadequate Investigation

On April 3, 2003, Texas Mutual transferred Morris's file to a new adjuster, Joy Rodgers. Four days later Rodgers took her first documented action on the file. On that day, April 7, 2003, Rodgers reviewed the file and called Bill Mitchell, the

fire chief of the Justin Volunteer Fire Department, to find out about Morris's 2000 Injury. According to Rodgers's claim diary, Mitchell told her that Morris returned "at full duty without any problems." On that same day, April 7, Rodgers prepared and filed a "Notice of Refused or Disputed Claim,"[20] giving notice that Texas Mutual disputed the claim.

By deposition, Rodgers testified that she knew she had a duty to investigate the claim, which included a procedure known as a "three-point contact." As its name suggests, a "three-point contact" entails contacting three sources of information: (1) the injured worker, (2) the employer, and (3) the medical provider. Rodgers admitted that she did not complete the three-point contact before disputing the claim.

Before Rodgers communicated Texas Mutual's denial of the claim, neither she nor anyone else spoke to Morris's surgeon, Dr. Neblett, even though the documentation submitted for preauthorization by Dr. Neblett indicated that the need for surgery arose from the 2000 Injury. Nor did Rodgers talk to any other treating doctor. Rosalind Thompson, a Texas Mutual claims supervisor, acknowledged that before Texas Mutual denied the claim it did not ask a doctor whether the 2000 Injury was a producing cause of Morris's surgery, even though Texas Mutual knew the names of the two doctors who had treated Morris from the time of the 2000 Injury to days before his surgery. And, although Rodgers, in her claims diary, noted that she called the surgeon, Dr. Neblett, she did not speak with the doctor but instead spoke to administrative personnel in his

---

19. After reviewing test results, Dr. Neblett determined that Morris was experiencing a "large left disc herniation at the L4–5 level" and "changes of concern at the L5–S1 level."

The L4–5 area of his spine was the same area injured in the June 12, 2000 incident.

20. This is also known as a "Form TWCC–21" and is filed with the Commission.

office to let them know that Texas Mutual was disputing the claim. Morris's expert testified that Dr. Neblett was the best person for Rodgers to speak with in conducting an investigation because he saw and physically examined Morris.

Notably, Rodgers did not even speak with Morris before denying his claim. Initially, Mitchell—the only person with whom Rodgers did speak—did not recall speaking to Rodgers, and Mitchell testified that he would not have told her Morris returned at full duty with no problems.[21] Rodgers apparently did not inquire into any of the details of Morris's injury. At best, the evidence shows that she made only a cursory inquiry with Mitchell into Morris's status when he returned to duty.

One fact that seemed to play heavily in Rodgers's decision to dispute coverage was that the description Morris gave for how he injured himself in 2000 differed from the cause reflected in Texas Mutual's records. Even with this variation, the date Morris gave for his injury—June 12, 2000—was correct. Before disputing the claim, Rodgers failed to ask Morris about this discrepancy. Although a field investigator was assigned to speak with Morris and apparently did speak with him a week or so after the surgery, the investigator apparently did not ask Morris about the discrepancy and did not ask him for medical records.

Frank Weedon, Morris's insurance expert, testified that Rodgers's investigation of the claim was not reasonable because she failed to conduct a "three point contact." Weedon explained that Rodgers did not speak to either Morris or his treating doctors, and, at most, had only a brief discussion with Mitchell before filing the dispute on April 7, 2003, the same day she first reviewed the file. Although Rodgers testified that she felt she did not need to speak with a doctor to learn more about Morris's physical condition before she disputed the claim, she knew about the three-point-contact principle and agreed that use of this method would have been the proper way to conduct an investigation. Reasonable jurors could have chosen not to believe Rodgers's claim that she did not need to speak with a doctor in this particular case.

### Other Actions by the Carrier Regarding the Claim

Texas Mutual continued to dispute coverage for the next several months. Texas Mutual asserted it did not receive an authorization from Morris to obtain medical records; however, Morris faxed an authorization form to Texas Mutual no later than mid-April 2003. The form was signed by his wife because he was back in the hospital at the time. Texas Mutual stated that it would not have been able to obtain any records with this form because Morris himself did not sign it, but it also appears that Texas Mutual did not attempt to obtain any records with the form. In addition, Morris said that no one at Texas Mutual ever asked him for another authorization and never requested his medical records.

Eventually, Morris retained attorneys to represent him in the dispute with Texas Mutual. On August 29, 2003, Morris's attorneys faxed to Texas Mutual some of Morris's medical records, including a page of treatment notes from Dr. Waldrop, the

---

**21.** On cross-examination, when Mitchell was asked whether he told Rodgers he was at full duty without any medical problems, he stated, "I guess I did. It says it right there." However, he then qualified his comment, testify-ing, "I can't tell you that I said it because I don't think he was at full duty without any problems" and "he was at full duty as much as his capacity allowed."

chiropractor Morris saw after the 2000 Injury. Documented in this page of treatment notes was Dr. Waldrop's treatment of Morris between November 2001 and January 2003. Morris's attorneys specifically sent this page because Texas Mutual said it had no record of treatments for Morris between 2001 and 2003. The notes indicate, among other things, that Morris had "L5/S1 n. root disc radiculopathy." [22] The Texas Mutual employee who was responsible for organizing the medical records testified that the company failed to forward this important page because the document was wrongly coded. She explained that this page was behind another page that was an approval for a new physician, Dr. King, who saw Morris from February to April, just before the surgery. Seeing the approval letter, she coded the documents following it as relating to the approval letter, apparently without checking to ensure that this coding determination was accurate. Another Texas Mutual employee testified that no other medical documents were wrongly coded.

In November 2003, Morris and Texas Mutual participated in a benefit-review conference at the Commission's offices, but the dispute was not resolved at that time. Texas Mutual requested that Morris submit to a medical examination by a doctor of its choice, and Morris agreed. Texas Mutual chose Dr. Stephen DeYoung. On January 7, 2004, Texas Mutual sent Dr. DeYoung a letter asking him to determine, among other things, whether the lumbar herniations that were surgically treated in April 2003, were causally related to the "lumbar strain" of the 2000 Injury. Texas Mutual represented that it had attached "all of the medical records currently avail-

able" to it for Dr. DeYoung's review. However, Texas Mutual did not forward any medical records from Dr. Waldrop, stating that it had "no documentation of medical treatment from the DOI,[23] to 02/19/03"—even though Texas Mutual had received the page of treatment notes from 2001–2003. In its summary of Morris's medical condition, Texas Mutual also pointed out that Dr. King's medical records reflected that the "mechanism of injury" was different than that reported by the employer. The first report of injury, on June 12, 2000, indicated that Morris strained his back after carrying a patient out of a ditch, while Dr. King reported that he "fell off the fire truck after slipping off tread steps." No one from Texas Mutual ever asked Morris about this discrepancy.

### Examination by Carrier's Chosen Doctor

On January 22, 2004, Dr. DeYoung examined Morris, who provided both an oral and written medical history. Morris told Dr. DeYoung that he was injured on June 12, 2000, when carrying a patient on a backboard out of a ditch to an ambulance, and that he had been receiving chiropractic treatment from Dr. Waldrop until he moved to Sugar Land and began seeing Dr. King in 2003. Morris did not tell Dr. DeYoung about an earlier injury he sustained in 1998, for which he received chiropractic treatments from Dr. Waldrop. At trial, Morris explained that he recovered fully from that incident and did not consider it an injury, and, for that reason, he did not tell Dr. DeYoung about it. Morris also explained that he did not fall off a truck; he began to fall and caught himself. The act of catching himself caused the injury.

---

**22.** Morris's expert testified that radiculopathy indicates neurological involvement. Waldrop's reference to radiculopathy factored into the Commission's decision that Morris was entitled to benefits.

**23.** We understand "DOI" to be a reference to the date of Morris's injury, June 12, 2000.

Dr. DeYoung wrote to Texas Mutual explaining that, given the lack of medical records, he could not determine whether Morris aggravated and accelerated his pre-existing lumbar disc degeneration and spondylosis, which ultimately led to a herniation, or whether the herniation was secondary to a disease of life. Therefore, Dr. DeYoung opined that (1) if Morris had no history of lower back difficulty prior to the 2000 Injury, and (2) if the medical records support ongoing difficulty with the lower back from the date of the 2000 Injury until Morris sustained the herniations in April 2003, he would give Morris "the benefit of the doubt and causally relate the disc herniations to the lumbar strain of June 2000 as a result of aggravation and acceleration of the pre-existing lumbar disc degeneration and spondylosis." Even though it had medical records from the very years Dr. DeYoung mentioned, and even though it had no records of an earlier injury, Texas Mutual continued to dispute the claim. Texas Mutual advised Morris that he would have to schedule a second benefit-review conference to resolve the dispute.

*The Commission's Benefit Review Officer's Ruling that Claimant's Herniated Disc was Related to the 2000 Injury*

A second benefit-review conference was held in June 2004, more than a year after the surgery. Again, the parties were unable to reach an agreement, at least in part because Texas Mutual claimed it still had no medical records reflecting continuing chiropractic treatments by Dr. Wal-

drop for the 2000 Injury. According to documentation from the Commission, Texas Mutual's position was that Dr. DeYoung's ability to determine causation was hampered because the records were not available; Morris countered that he had provided the records to Texas Mutual several times and had no control over whether Texas Mutual forwarded them to Dr. DeYoung.[24] The benefit-review officer noted the gap in the medical records, but still recommended the payment of benefits to Morris.[25] The review officer found the following:

A review of the initial medical records from Dr. Waldrop noted the claimant's symptoms, *which are consistent with the current diagnoses at L4–L5 and at L5–S1.* There are medical records from other doctors in the file supporting a causal connection between the findings on the diagnostic studies performed in 2003 and the original injury.

(emphasis added). In reaching her conclusion, the benefit-review officer also found significant the reference to radiculopathy in Dr. Waldrop's notes of November 21, 2001. Texas Mutual declined to accept this recommendation, and a benefit contested-case hearing was scheduled for July 2004.

*The Contested Case Hearing*

On July 1, 2004, in preparation for the contested-case hearing, Texas Mutual forwarded to Dr. DeYoung medical records showing Morris's "initial treatment" with

---

24. Morris's expert testified that a conscientious adjuster would have requested medical records long before this point in time.

25. The benefit-review officer's recommendation included the following notation: "[w]ithout the entry of 11/21/01 from Dr. Waldrop's office, noting that [Morris] had problems at L5–S1 with radiculopathy, a favorable recom-

mendation would not have been made for the claimant because of the gap in the medical records thereafter (10 months gap). However, the symptoms were noted before the gap in the medical records and other incidents noted in Dr. King's records cannot be deemed at this point to have resulted in an intervening injury to [Morris's] lower back."

Dr. Waldrop, and asked him to review the records and determine whether the April 2003 herniations were the result of a pre-existing condition or the 2000 Injury. Once again, Texas Mutual did not include the page of Dr. Waldrop's records showing that Morris had a number of chiropractic treatments between 2001 and 2003. In response, Dr. DeYoung reported that the records were "limited" and "did not provide any detail with respect to his history and examination." He also noted that the records showed that Morris "was last treated by Dr. Waldrop in January 2001." This time, Dr. DeYoung opined that if Morris did not receive any medical treatment for his lower back between January 2001 and February 2003 (when Morris saw Dr. King), he would attribute Morris's condition "more to a disease of life than the work related injury."

At the contested-case hearing, the Commission received sworn testimony and evidence, and ultimately determined that "[t]he herniations in [Morris's] lumbar spine at levels L4–5 and L5–S1 were caused and/or aggravated by, and naturally resulted from, his June 12, 2000 injury." Consistent with the benefit-review officer's recommendation, the Commission noted that the medical evidence showed that Morris was complaining of an L5–S1 radiculopathy in November 2001, when he was receiving treatment from Dr. Waldrop. The Commission's decision reflected that it

was based largely upon Morris's testimony that he had no prior history of back problems, and that he had required continuous treatment since the 2000 Injury—testimony that satisfied the conditions under which Dr. DeYoung would find causation.[26] The Commission ordered Texas Mutual to pay medical benefits to Morris. Texas Mutual did not appeal this decision.

### Carrier's Actions Following Discovery of the 1998 Back Strain

After Morris filed suit against Texas Mutual and discovery ensued, Texas Mutual learned that Morris strained or sprained his back in 1998, when he slipped on or fell from the running board of a fire truck two years before the 2000 Injury. At that time, Morris missed two weeks of work and underwent numerous chiropractic treatments. Texas Mutual counterclaimed for fraud, alleging that Morris fraudulently testified before the Commission that he had no back injuries before the 2000 Injury.

When Dr. DeYoung—the doctor who in his first opinion had given Morris the benefit of the doubt in determining that the 2000 Injury was causally related to the 2003 herniated disc—was later deposed, he was asked whether the medical information concerning Morris's 1998 back injury and the treatments by Dr. Waldrop after the 2000 Injury changed his earlier opinion. Dr. DeYoung testified that, based on

---

26. In relevant part, the "Background Information" section of the decision provided as follows:

The Claimant's testimony was credible, and it and the medical evidence established that the herniations at levels L4–5 and L5–S1 of his lumbosacral spine naturally resulted from his compensable June 12, 2000 injury. The medical evidence, while allegedly somewhat incomplete, does show that the Claimant was complaining of neurological symptoms and radiculopathy prior to a significant gap in his medical records. The

report of the Carrier's doctor, Dr. Stephen DeYoung, also demonstrates that it is likely, if the Claimant had no prior back problems/injuries, and if he has had low back complaints since June 12, 2000, that his current herniations are causally connected to the June 12, 2000 injury. The Claimant's testimony demonstrated that he had no back problems before June 12, 2000 and he has had difficulty with his low back since June 12, 2000. He met his burden of proof on the issue.

this information, he would conclude that the 2000 Injury was not causally related to the herniated disc requiring surgery in April 2003. However, on cross-examination, Dr. DeYoung admitted that Dr. Waldrop's omitted treatment notes did reflect "periodic" treatments between 2000 and 2003, the specific time frame Dr. DeYoung had indicated to Texas Mutual was most important to his evaluation. He also acknowledged that Morris's medical records reflected that Morris had between 25 and 30 treatments between June 2000 and March 2003, contrary to Texas Mutual's representation that it had no documentation of treatment in that time frame. Dr. DeYoung also admitted that, while Morris had received chiropractic treatments before the 2000 Injury, he had not received treatment from a medical doctor, and he was able to return to work after the 1998 incident.

Texas Mutual also contends that Dr. DeYoung was not misled about Morris's treatment with Dr. Waldrop because Morris gave him an oral medical history that included Dr. Waldrop's treatment of him between the time of the 2000 Injury and January 1, 2003. However, Dr. DeYoung testified that if an insurance company wrongly told him it did not have documentation of treatment when the company did have it, he would be "concerned that I was being a little misled if I didn't have all of the correct information." He also testified that he was most interested in records from that time frame because "it would be probably the most important time period for making an accurate assessment of [Morris's] medical problem" and he relied on Texas Mutual to give him all the medical records it had.

Additionally, Morris's expert testified that Texas Mutual could refuse the claim only if another event was the sole cause of the herniated disc. Thus, according to Morris's expert, even if the 2000 Injury were a "one percent" cause of the herniated disc because it aggravated an earlier condition, it would be compensable and causally related. Texas Mutual's own expert agreed that Texas Mutual could use the 1998 injury as a justification for not paying for the surgery only if the 1998 injury was the sole cause of the herniated disc. But, Dr. DeYoung did not testify that the 1998 injury was the sole cause of the herniated disc; in fact, no doctor at trial testified that the 1998 injury was the sole cause of the herniated disc. And, as Dr. DeYoung acknowledged, the nature of Morris's injury in 2000 was one that may aggravate a pre-existing back problem and lead to a disc herniation.

Thus, the jury had before it proof that the claims adjuster (Rodgers) denied or disputed the claim the first day she looked at the file and that, in deciding to deny or dispute coverage, she ignored accepted methods of investigating a claim. One of the adjuster's proffered reasons for disputing coverage was that the description of the original injury did not match the injury shown on file, but the adjuster never asked Morris about this discrepancy. The jury had proof that Morris's attorneys provided Texas Mutual the relevant medical records, and that Morris signed a release so that Texas Mutual could obtain any other relevant records, but Texas Mutual failed to forward a crucial page from these records to its medical expert and failed to do so on more than one occasion. Texas Mutual's representatives said that the company did not forward the page of medical notes because the document was wrongly coded, but no other page of medical notes was wrongly coded. Further, although Texas Mutual contended that either an undisclosed earlier injury or a new injury in 2003 caused Morris's herniated disc, Texas Mutual offered no evidence that it had any reason to believe that any new or

pre-existing injury was the sole cause of Morris's herniation that would have precluded coverage.[27] Finally, the jury heard Dr. DeYoung admit that a back injury initially reported as a back strain may lead to a disc herniation requiring a lumbar laminectomy. Thus, the jury could have concluded that Texas Mutual's assertions were merely a pretext to justify its refusal to pay for Morris's surgery.

*Medical History Regarding Treatment After the 2000 Injury*

Texas Mutual claims that nothing in its file reflected that Morris was treated after the 2000 Injury and that Rodgers confirmed this by speaking with Mitchell, who, according to Rodgers, said that Morris returned to full duty without any problems. Texas Mutual also claims that further investigation of the incident did not reveal much more. According to Texas Mutual, "[a]lthough [Texas Mutual] requested that Morris provide medical records, few of those records were provided."

The record, however, contains conflicting evidence. First, Mitchell testified he could not remember speaking with Rodgers, and that he would not have told her that Morris returned to full duty. Second, Morris's lawyers sent medical records to Texas Mutual—including the page of treatment notes from Dr. Waldrop—showing a number of visits by Morris between 2001 and 2003. Once he was shown the records, even Dr. DeYoung agreed that Morris received 25 to 30 treatments between the time of the 2000 Injury and April of 2003, during the time frame Dr. DeYoung considered critical to his evaluation.

At trial, Texas Mutual admitted that it had in its possession this key page of medical treatment notes and that it never gave the notes to Dr. DeYoung—even

though Dr. Young had stated how significant this material would be to his assessment of a connection between the 2000 Injury and the 2003 surgery. Though Texas Mutual said it overlooked the page because it was wrongly coded, this was the only page of medical notes that was wrongly coded; the remainder of the medical records made it to Dr. DeYoung. As a result of the coding error, Dr. Waldrop's notes from 2001–2003 repeatedly failed to make it to Dr. DeYoung. A jury could have found it too coincidental that, out of all the medical records, the only one wrongly coded was the critical page showing a causal link between the 2000 Injury and the 2003 surgery.

In a related argument, Texas Mutual contends that Morris hampered its investigation by providing it with a release form signed by Morris's wife rather than by Morris. Texas Mutual contends that a form signed by anyone other than Morris would not have entitled Texas Mutual to obtain Morris's records. However, Texas Mutual also had an authorization signed by Morris. Before the second benefit-review conference, at Texas Mutual's request, Morris personally signed an authorization for Texas Mutual to obtain his records from Dr. Waldrop. In addition, Texas Mutual points to no evidence that Dr. Waldrop's office refused to provide medical records based on either authorization, and Morris testified that Texas Mutual never told him it could not use the authorization form signed by Morris's wife. Morris also testified that Texas Mutual never asked for the records. Therefore, whether the authorization signed by Morris's wife would have enabled Texas Mutual to obtain Morris's medical records is irrelevant,

---

**27.** In fact, Texas Mutual did not know about the 1998 injury until the parties were preparing for the trial in this case, so this was not a reason for its earlier denial.

because the evidence does not show that Texas Mutual ever sought to obtain any records with it and was refused, and the evidence affirmatively shows that Morris himself gave Texas Mutual an authorization he had signed to enable the company to obtain medical records from Dr. Waldrop's files.

### The 1998 Injury as Possibly Precluding a Finding of "Reasonably Clear Liability"

We next consider two arguments Texas Mutual urges: (1) that liability never became reasonably clear because of the undisclosed 1998 back strain or sprain, and (2) that if Morris had disclosed the 1998 injury before the contested-case hearing, Dr. DeYoung would have concluded that Morris's back surgery in April 2003, was not related to the 2000 Injury, and the Commission likely would have concluded that Morris was not entitled to benefits.

First, Texas Mutual does not dispute that Morris suffered a compensable injury on June 12, 2000; its dispute is over the extent of the injury, i.e., whether the 2000 Injury was a producing cause of the herniation requiring surgery. In effect, Texas Mutual suggests that its liability for Morris's surgery has never become "reasonably clear" because of Morris's allegedly undisclosed back strain or sprain in 1998.[28]

Under the law governing workers' compensation carriers, the term "injury" includes the aggravation of a pre-existing condition. *See* TEX. LAB.CODE ANN. § 401.011(26) (Vernon 2006); *City of Pasadena v. Olvera,* 95 S.W.3d 494, 497 (Tex. App.-Houston [1st Dist.] 2002, no pet.). To defeat coverage, a pre-existing condition or bodily infirmity must be the sole cause of the present disability or incapacity. *See Texas Employers' Ins. Ass'n v. Page,* 553 S.W.2d 98, 100 (Tex.1977); *Transcontinental Ins. Co. v. Crump,* 274 S.W.3d 86, 100 (Tex.App.-Houston [14th Dist.] 2008, pet. filed). As noted above, Dr. DeYoung never opined that Morris's back injury in 1998 was the sole cause of his herniation. In addition, both a Texas Mutual claims supervisor and Texas Mutual's expert, Wayne Davidson, acknowledged that Texas Mutual is obligated to pay for aggravation of a pre-existing injury. Thus, even presuming that any prior back strain Morris may have suffered in 1998 was still affecting him in 2003, the jury reasonably could have concluded that Morris's compensable back injury in 2000 aggravated a pre-existing condition and that the earlier injury would not have provided a reasonable basis for denying Texas Mutual's obligation to pay for the required

---

**28.** Texas Mutual also asserts that, by submitting a jury question on fraud, the trial court effectively found that Texas Mutual "proved a prima facie case of fraud." *See* TEX.R. CIV. P. 278 ("The court shall submit the questions ... which are raised by the written pleadings and the evidence."). Consequently, Texas Mutual urges, the evidence cannot simultaneously support Texas Mutual's claim that Morris committed fraud and Morris's claim that Texas Mutual had no reasonable basis to deny or delay paying the claim. But, the mere fact that a trial judge submitted a fraud question to the jury does not prove that there must have been some evidence of fraud; indeed, the jury found that Morris did not commit fraud, and Texas Mutual has not challenged this finding. At trial, Morris testified that he did not previously reveal the 1998 back strain because he recovered from it and so did not consider it an "injury." Similarly, Bill Mitchell testified that initially he did not even remember Morris being injured in 1998, and he explained that, in his view, a back strain is "[j]ust something that happens" and "[y]ou get over it and go on." Morris was extensively cross-examined concerning his credibility, and the jury was free to accept his explanation and find against Texas Mutual on its fraud claim. Accordingly, no circumstance of inconsistent, simultaneous proof of fraud and bad faith exists.

medical treatment.[29]

Second, we consider Texas Mutual's claim that Morris's alleged duplicity in not revealing the 1998 injury "stacked the deck in his favor" so that both Dr. DeYoung and the Commission held in his favor when they otherwise would not have done so. This argument prompts four responses:

(1) The jury had before it all the evidence concerning Morris's failure to tell Texas Mutual and his doctors about the 1998 injury and Morris's explanation for why he did not think to tell anyone about it. Morris explained that he did not fall off the truck, but caught himself as he was about to fall, and that the act of stopping the fall injured him. Morris testified that he did not think to tell Dr. DeYoung about it because he fully recovered. The jury was asked if Morris committed fraud by not revealing the injury and the jury said he did not commit fraud.

(2) Dr. DeYoung testified via deposition and both parties had the opportunity to ask him what impact the revelation of the 1998 injury had on his diagnosis. Neither party directly asked him the question.

(3) As to the Commission's decision and whether it would stand if the Commission had known the truth about the 1998 injury, to ask us to engage in "what ifs" regarding the Commission's decision at the contested hearing is to ask us to speculate. That we will not do.

(4) Even if Dr. DeYoung and the Commission had known about the 1998 injury, the jury heard testimony that Texas Mutual could avoid liability only if the

1998 injury were the sole cause of the herniated disc and resulting surgery. No one testified that the 1998 injury was the sole cause of the herniated disc, and Texas Mutual presented no evidence that it reasonably believed this injury to be the sole cause of Morris's disc herniation.

## The Alleged New Injury in 2003 and the Claimant's Inaccurate Description of His 2000 Injury as Possible Cause for Reversal

Texas Mutual also contends that it reasonably disputed coverage because it believed Morris's surgery was a result of a "new and more severe injury in 2003," and not the 2000 Injury. However, Texas Mutual never offered any evidence of a new injury, or any evidence that another injury necessitated the surgery. Dr. DeYoung testified by deposition that lumbar laminectomies are performed for herniated discs, not back strains, and, based on the medical records, Morris did not have a herniated disc before March of 2003. But on cross-examination in that deposition, Dr. DeYoung also stated that a back strain could lead to a herniated disc. In general, Dr. DeYoung was equivocal concerning the cause of Morris's herniation, stating that it was "really not clear" from the records, but nevertheless he would relate it to "some activity around the onset of his lower—of his severe lower back and leg pain and numbness and tingling" that developed shortly before the surgery. Dr. DeYoung, however, apparently did not take into account the reference in Dr. Waldrop's treatment notes to radiculopathy, because Dr. DeYoung testified that Mor-

---

**29.** Texas Mutual protests on rehearing that this court is improperly imposing a burden on Texas Mutual to prove that Morris's back injury in 1998 was the sole cause of his herniation. This court has not imposed any such burden on Texas Mutual. Rather we have inquired into whether there is legally sufficient evidence to support the jury's finding of "reasonably clear liability."

ris's records did not contain any description of radicular symptoms related to the 2000 Injury.

Texas Mutual also points to Morris's inaccurate description of the events surrounding the 2000 Injury as one reason it believed a different injury caused the need for surgery. Although Morris described a different incident to treating doctors in 2003—slipping on or falling from a fire truck—the date Morris consistently gave for the incident (June 12, 2000) was the same as that of the undisputedly compensable injury. But, as previously noted, no one from Texas Mutual ever asked Morris about the discrepancy. The jury could have concluded that Morris was merely confused about which incident happened in 2000 or unintentionally attributed his pain in 2003 to slipping or falling off a fire truck instead of lifting a patient out of a ditch on a backboard, or the jury may not have considered the discrepancy significant enough to raise a question about coverage. Likewise, the jury may have viewed Texas Mutual's failure to ask about the discrepancy as one additional indication that Texas Mutual did not reasonably investigate the claim.

*Carrier's Expert Testimony*

■ Finally, citing the testimony of Dr. DeYoung and Wayne Davidson, Texas Mutual's workers' compensation expert, Texas Mutual contends that the evidence "only shows a bona fide dispute, not clear liability." However, the mere fact that a carrier offers expert testimony to support its position at trial does not insulate the carrier from liability. *See State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997). Dr. DeYoung admitted that Texas Mutual did not give him medical records about Morris's treatment between 2001 and 2003—the very time frame that Dr. DeY-

oung had told Texas Mutual was important to his evaluation—and the jury was entitled to conclude that Dr. DeYoung's initial opinions were based on inadequate information. *See id.*

Moreover, although Dr. DeYoung ultimately concluded that Morris's lumbar herniation requiring surgery was not causally related to the 2000 Injury, the jury was presented with other evidence it reasonably could have considered when determining the weight to give Dr. DeYoung's opinion. First, the jury could have determined that Dr. DeYoung's opinion was undermined by his testimony that the records relating to Morris's injury did not contain a description of radicular symptoms, when Dr. Waldrop's treatment records actually reflected that Morris suffered from an "L5/SI n. root disc radiculopathy" after the 2000 Injury, and this notation in the records was a factor that the Commission considered in finding in Morris's favor. Second, Dr. DeYoung's testimony that a new and independent injury caused Morris's herniation was at best speculative. No new incident was ever identified, and Dr. DeYoung admitted that it was "really not clear in the medical records what caused it," but he nevertheless opined that he would relate Morris's herniated disc to "some activity" occurring about two days before March 28, 2003. The jury also could have considered Dr. DeYoung's acknowledgment that the mechanism of injury Morris originally reported in connection with the 2000 Injury, initially reported as a back strain, ultimately could lead to a disc herniation. Given the evidence before it, the jury was entitled to discount Dr. DeYoung's subsequent opinion that Morris's lumbar herniations were not causally related to the lumbar strain suffered in

connection with the 2000 Injury.[30] Likewise, the jury was entitled to reject Davidson's testimony on the ultimate issue of whether Texas Mutual violated the Texas Insurance Code and to base its decision on other evidence.[31]

As Morris points out, other evidence in the record would enable a reasonable jury to find no reasonable investigation by Texas Mutual and reasonably clear liability for Texas Mutual on Morris's claim.

*The Carrier's Claim that the Adjuster Would Not Have Learned Any Useful Information Even if She Had Spoken with the Claimant's Surgeon*

Texas Mutual also claims that the evidence does not support liability for failure to conduct a reasonable investigation because Dr. Neblett could not have given Rodgers information showing that Texas Mutual's liability was reasonably clear. Texas Mutual explains that Dr. Neblett "never examined or treated Morris before April 2003, and there is no evidence that Dr. Neblett could have offered any additional information to show a causal relationship existed." We disagree.

First, Morris's workers' compensation expert, who was experienced in handling claims like Morris's, testified that Dr. Neblett was the best person for Rodgers to call. He explained that Dr. Neblett was the only doctor who had examined Morris to ascertain the exact problem with his back. Rodgers would have spoken with Dr. Neblett after the surgery. At that point, Dr. Neblett knew the state of Morris's spine better than anyone else, even Dr. Waldrop. Having that information alone would have been useful to the investigation. In addition, even without this testimony, we know that Dr. Neblett spoke with Morris and obtained some medical history, because, for example, he listed the date of the 2000 Injury as the date of initial injury in his letter to Texas Mutual.

Second, even if Dr. Neblett could not have given Rodgers any information, Morris had significant knowledge concerning the injury and the medical care he received, and Rodgers never once spoke to him. Had she done so, Morris could have told her about the chiropractic visits, and he could have explained the discrepancy in what was listed as the cause of the 2000 Injury.

In short, on the day that Rodgers first picked up Morris's file, she decided to dispute liability before speaking with the two people who could have enlightened her the most—Dr. Neblett and Morris. We are not persuaded by Texas Mutual's argument.

In summary, on this issue as to whether the evidence supports a finding of "no reasonable investigation" or "reasonably

**30.** *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex.1998) (uncontroverted expert testimony may be regarded as conclusive only if the nature of the subject matter requires the factfinder to be guided solely by the opinion of experts and the evidence is otherwise credible and free from contradictions and inconsistency); *Gregory v. Tex. Emp. Ins. Ass'n*, 530 S.W.2d 105, 107 (Tex.1975) (opinion testimony is generally held not to be binding on the factfinder if more than one possible conclusion can be drawn from the facts); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 119–20 (Tex.App.-Beaumont 2005, pet. denied) (concluding that jury reasonably could reject insurer's expert's testimony that worker was intoxicated due to marijuana use at time of his injury even though no other expert testified, when worker testified he was not impaired at the time and circumstantial evidence supported jury's finding in worker's favor).

**31.** *See Nicolau*, 951 S.W.2d at 450 (noting that the jury, and not a reviewing court, has the responsibility of deciding whether a carrier acted in bad faith).

clear liability," the jury had before it proof that

- Medical and non-medical personnel at Texas Mutual initially authorized the surgery;
- Texas Mutual's adjuster (Rodgers) disputed coverage the same day she first reviewed the file, ignored accepted methods of investigating a claim, may or may not have spoken briefly with Morris's former employer, never spoke with the two people who would know the most about the initial injury and/or the current state of Morris's spine, and did not speak with any other treating physician before deciding to dispute the claim;
- Texas Mutual complained that it had trouble getting Morris's medical records, yet Morris's attorneys faxed his records to Texas Mutual on more than one occasion, Morris's wife signed a release for Morris's medical records as early as mid-April, and Morris himself signed a release for his medical records;
- Twice Texas Mutual sent medical records to its medical expert (Dr. DeYoung) claiming that those were all the records when, in fact, one key page detailing multiple visits to Dr. Waldrop was left out of the file;
- The page left out of the records sent to Dr. DeYoung showed that Morris saw Dr. Waldrop between the 2000 Injury and the 2003 surgery;
- Dr. DeYoung informed Texas Mutual that he would give Morris the benefit of the doubt if Morris's records supported ongoing trouble with his back and if he had no back trouble prior to 2000. Texas Mutual either did not know its files well enough to know that it had a page of treatment notes from Dr. Waldrop showing visits between 2001 and 2003, or it chose not

to give the sheet to Dr. DeYoung. Either way, the jury reasonably could have concluded that Texas Mutual acted unreasonably.

Reasonable jurors could have concluded from this evidence that Texas Mutual failed to reasonably investigate the claim and that, after failing to attempt in good faith to settle the claim when its liability had become reasonably clear, Texas Mutual intentionally undertook a pretextual investigation designed to support its denial of the claim. We hold that, under the applicable standard of review, the evidence is legally sufficient to support a finding that (1) Texas Mutual refused to pay Morris's claim without conducting a reasonable investigation with respect to the claim; and (2) Texas Mutual failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Morris's claim when its liability had become reasonably clear. Even if the evidence were legally insufficient to support only one of these two findings, Texas Mutual's legal-sufficiency challenge regarding the jury's answer to Question 2 would fail based on the legally sufficient evidence as to the other finding. Accordingly, we overrule Texas Mutual's first issue.

**B. Legal Sufficiency of Evidence Supporting the Jury's Finding that the Carrier Knowingly Violated the Texas Insurance Code**

In its second issue, Texas Mutual contends that no evidence supports the finding that the company knowingly violated the Texas Insurance Code because "all of the competent evidence shows that Texas Mutual and its representatives believed the claim was not valid because the evidence available to Texas Mutual showed that the back strain Morris sustained in 2000 was unrelated to the herniated disc he was diagnosed with in 2003." Accord-

ing to Texas Mutual, the only evidence Morris offered to show Texas Mutual acted knowingly was the testimony of its liability expert, which was conclusory, not competent, and thus no evidence.

In Question 3, the trial court asked the jury whether Texas Mutual knowingly engaged in the conduct described in Question 2, discussed above. Consistent with section 541.002, the trial court instructed the jury that:

> "Knowingly" means actual awareness of the falsity, unfairness, or deception of the act or practice described in Question 2. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

See TEX. INS.CODE ANN. § 541.002(1) (Vernon 2009) (defining "knowingly"). Based on the jury's affirmative finding, it awarded Morris $50,000 in damages for mental anguish and $500,000 in additional damages, both of which are recoverable only if the Texas Insurance Code violation was committed knowingly. *See Minn. Life Ins. Co. v. Vasquez*, 192 S.W.3d 774, 777 (Tex.2006). The trial court later reduced the award of additional damages to $250,000.

■■ As the Supreme Court of Texas explained in *Vasquez*, claimants are not entitled to extra-contractual damages because the insurer was negligent; instead, these extra damages are reserved for cases in which an insurer knew its actions were false, deceptive, or unfair. *Id.* at 775. Claims for extra-contractual damages should not be a routine addition to every breach-of-policy case. *Id.* For this reason, appellate courts are required to conduct an exacting review of damages that punish rather than compensate. *Id.*

The following facts, viewed as a whole, are sufficient to support a finding by reasonable jurors that Texas Mutual was not merely negligent, but that it knowingly failed to effectuate a prompt, fair, and equitable settlement of a claim with respect to which its liability had become reasonably clear, and refused to pay a claim without conducting a reasonable investigation with respect to the claim. The evidence supports a conclusion by reasonable jurors that persons at Texas Mutual were actually aware of the unfairness of their actions.

Rodgers was Texas Mutual's adjuster on Morris's claim and the one who filed the TWCC–21 disputing his claim.[32] Before she was assigned the claim, it had been handled by another adjuster and was not in dispute. Rogers was assigned the claim the day after Morris's surgery, and the first day she took any documented action, she filed the dispute. As discussed above, Rodgers admitted that she did not complete the three-point contact before disputing the claim, because she did not contact either Dr. Neblett or Morris. Morris's expert, Frank Weedon, testified that Dr. Neblett, as the treating surgeon, was "in the best position" to answer questions regarding whether Morris's surgery was related to the 2000 Injury. Yet, no one ever contacted Dr. Neblett about Morris's surgery.

Rodgers also testified that she had no idea how much time she spent investigating Morris's claim, she did not know if she had all the information she needed before she filed the dispute, and she did not remember if she had any medical information relating to the claim when she filed the TWCC–21 notice that the claim was disputed. She also testified that she had no idea how Morris was supposed to se-

---

**32.** *See supra*, p. 11 & n. 20.

cure medical treatment for his back after Texas Mutual disputed his claim.

In addition, Rodgers filed the TWCC–21 after Texas Mutual had preauthorized the surgery based on Dr. Neblett's request, when Texas Mutual's position—after a doctor and another Texas Mutual employee had examined the file—was that the claim was not in dispute. Weedon testified that Rodgers, as a licensed insurance adjuster, "knew the rule[s]," and had a duty to act reasonably, to fairly resolve the claim, and to investigate it. Weedon opined that Rodgers knew she was mishandling the claim, or, as he stated it, "running a red light," when she denied the claim without reasonably investigating after Texas Mutual had preauthorized Morris's surgery. Weedon further testified that Rodgers's actions were false, deceptive, and unfair. He also testified that, once Texas Mutual preauthorized the procedure as reasonable and necessary to treat the condition, and there was no dispute concerning compensability or the extent of the injury, to later dispute the claim was an unconscionable act and an unfair claims practice that was "thoroughly prohibited."

■ Texas Mutual contends that Weedon's testimony was not competent evidence of a knowing violation because it was conclusory. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex.2004) (stating that conclusory or speculative opinion testimony is incompetent evidence and cannot support a judgment). However, Weedon explained that the underlying basis for his opinion was his own experience in going through the training to be a licensed insurance adjuster, a position he held for eight years. Further, Rodgers confirmed that she was a licensed adjuster and that she knew the rules for conducting a reasonable investigation.

In fact, no one at Texas Mutual ever spoke with Dr. Waldrop, or Dr. King, or Dr. Neblett, the three medical providers who would be in a position to testify about Morris's pre-surgery condition. Texas Mutual personnel testified that they did not need to speak with a doctor to dispute the claim. Weedon's testimony, when coupled with Texas Mutual's complete failure to speak with any of Morris's doctors, is some evidence supporting the jury's finding that Texas Mutual knowingly violated the Texas Insurance Code.

Additionally, as discussed in greater detail above, Texas Mutual falsely represented to Dr. DeYoung that it had received no documentation of Morris's medical treatment from the date of the 2000 Injury to February 19, 2003, when, in fact, it had received Dr. Waldrop's treatment notes from that time period. Without medical records from the relevant time period, Dr. DeYoung gave Morris "the benefit of the doubt" and conditionally attributed Morris's disc herniation to "the lumbar strain of June 2000." Thereafter, Texas Mutual represented that it was forwarding medical records of Morris's treatment with Dr. Waldrop, but it failed to forward the page of Dr. Waldrop's treatment notes reflecting treatments between 2001 and 2003— the specific time frame that had been the subject of Dr. DeYoung's inquiry. This failure caused Dr. DeYoung to rely on incomplete information when he issued a later opinion supporting Texas Mutual's dispute of Morris's claim. Concerning Texas Mutual's failure to provide Dr. Waldrop's treatment notes, Dr. DeYoung testified:

Q: Would it, in your opinion, be fraud for an insurance company to withhold an important piece of medical evidence from a doctor providing an important evaluation?

A: I mean, I—obviously if they knowingly, you know, left something out, I would obviously consider that—consider that wrong.

Dr. DeYoung also acknowledged that the treatment notes Texas Mutual withheld from him were from the time period he considered "the most important time period for making an accurate assessment of [Morris's] medical condition." Although a Texas Mutual employee testified that this page of notes was incorrectly coded, another Texas Mutual employee admitted that no other medical records were wrongly coded. Members of the jury were able to see these witnesses and decide for themselves whether they believed the reason for the failure to provide the document.

In addition, although Texas Mutual claims that it refused to pay because it thought that a new or an older, different injury caused the herniated disc, Morris's expert, Weedon, stated that a licensed adjuster would know that a new or older, different injury would displace the 2000 Injury as a producing cause of the injury only if the injury was the sole cause of the herniated disc. In fact, Weedon testified that the 2000 Injury still would be a producing cause if it only aggravated an earlier injury by as little as one percent. In the period leading up to and including the contested-case hearing before the Commission, Texas Mutual had no evidence of an earlier injury.

Weedon also testified that Texas Mutual's delays in (i) obtaining Morris's full medical records (approximately fourteen months), (ii) scheduling a physical examination by a doctor of its choice (eight months), and (iii) scheduling the contested-case hearing were unreasonable and that Texas Mutual employees would know these delays were unreasonable and unfair, especially since Morris's operation already was concluded and medical costs already had

been incurred when Texas Mutual first disputed the claim.

Finally, although Rodgers and others based Texas Mutual's continuing denial of the claim in part on Morris's inaccurate description of the cause of the 2000 Injury, no one at Texas Mutual ever asked Morris about the discrepancy until after the conclusion of the contested-case hearing, during discovery in this case. In addition, personnel at Texas Mutual never acknowledged that Morris consistently listed the date of injury as June 12, 2000. The jury certainly could have concluded that a person performing a reasonable investigation would want to know more about the matter, but Texas Mutual never inquired. This also is some evidence of a knowing failure to reasonably investigate and a knowing failure to settle a claim as to which Texas Mutual's liability had become reasonably clear.

Under the applicable standard of review, the record contains legally sufficient evidence of objective manifestations indicating that Texas Mutual acted with actual awareness of the falsity, unfairness, or deception of the two unfair acts or practices discussed above. Even if the evidence were legally insufficient to support the jury's finding as to one of these two acts or practices, legally sufficient evidence as to the other act or practice would be sufficient to overrule Texas Mutual's legal-sufficiency challenge regarding the jury's answer to Question 3. Accordingly, we overrule Texas Mutual's second issue.

## C. Legal Sufficiency of Evidence Supporting the Award of Mental Anguish Damages

In the judgment, the trial court awards Morris a total of $125,000 in actual damages, which includes $50,000 for past mental anguish. In its fourth issue, Texas

Mutual contends that the evidence supporting these damages is legally insufficient. Specifically, Texas Mutual contends that the evidence presented to support the mental-anguish damages amounted to no more than mere worry, anxiety, vexation, embarrassment, or anger, which is insufficient to support a recovery of such damages. Texas Mutual also points to evidence that Morris never sought treatment for any mental or emotional problems, and that he represented to doctors in 2005 and 2006 that he did not suffer from any depression, anxiety, tension, memory loss, or difficulty sleeping. Further, Texas Mutual contends that the evidence Morris cited regarding physical pain and discomfort he experienced in connection with his back injury, including an infection he developed after surgery, cannot support an award of damages because it is directly related to Morris's underlying physical injury.

### 1. Claimant's Burden to Recover Mental Anguish Damages

Generally, to recover mental-anguish damages, the claimant must introduce direct evidence of the nature, duration, and severity of the mental anguish, thus establishing a substantial disruption in the claimant's daily routine. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex.1997); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995). Direct evidence may be in the form of the claimant's own testimony, that of a third party, or that of an expert. *Parkway Co.*, 901 S.W.2d at 444. In the absence of direct evidence of the nature, duration, or severity of the mental anguish, we determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment or anger to support any award of damages. *Id.* Mental anguish includes the mental sensation of pain resulting from such painful emotions

as grief, severe disappointment, indignation, wounded pride, shame, despair, and public humiliation. *Id.* Additionally, the record must contain evidence that the amount found is fair and reasonable compensation. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Courts must "closely scrutinize" awards of mental-anguish damages. *Giles*, 950 S.W.2d at 54.

### 2. Facts Showing Mental Anguish

Morris testified that the day after his surgery he learned that Texas Mutual was disputing his claim and would not pay any of his medical bills. He testified that he was extremely scared and worried because he knew he could not pay the medical bills. Only a few days later, he learned that he had a potentially life-threatening staph infection at the incision site. He returned to the hospital but was told to "get out" because he had no insurance coverage. However, Dr. Neblett found another doctor to donate his time and treat Morris. To help him recover from the staph infection, the hospital put Morris in a special room. The entire time Morris was there his constant worries were not only whether he would get better and whether he would survive the infection, but also how he would pay for the room and the medicine they were "pumping through him."

Morris further testified that when the hospital discharged him following the staph infection, because he had no insurance coverage, he received no follow-up care. Morris continued to be hooked up to an intravenous apparatus; only once did a nurse come to check on him and show him how to hook it up. Asked how it felt to go through this ordeal, Morris testified, "It makes you sick. Makes you sick to your stomach." He said he felt as though the world was "crashing down" on him.

Then, to worsen matters, Morris began receiving past-due notices from his medical providers, who complained that he had not paid his medical bills. Several providers threatened to turn his unpaid bills over to a credit bureau. Morris testified that his credit rating dropped, an event that was significant to him because he was a newly-wed and wanted to be "the man of the house," to make a living, and to provide for his family. Instead, he was faced with a stack of medical bills he could not pay. Morris always had enjoyed an excellent credit reputation and was proud of this fact. He said it was demeaning to go to a hardware store and be turned down for credit for a $500 washing machine. "It's pretty embarrassing. Anyone can go get a washing machine except me." In addition, because his credit rating was poor, he also could not be listed on the mortgage for his family home. Only his wife was listed, which Morris testified made him feel like "a nothing."

When asked at trial what he thought about Texas Mutual's actions, he said it "[f]eels like somebody rips your heart out a lot of times and jumps up and down on it." Morris testified that he wakes up in the middle of the night and thinks about Texas Mutual's actions. And, as of the time of trial, he had not gotten over what Texas Mutual did.

Morris's wife also testified about the emotional toll Morris suffered as a result of Texas Mutual's decision to dispute coverage, to refuse to pay his medical bills, and to refuse to settle. She said Morris was "a basket case" when the hospital told them he had no insurance coverage and he could not be treated there. When Morris learned that his medical bills would not be paid, it hurt his pride. But more than that, the long-term effect was that he felt "useless," "worthless," and "degraded" because he could not take care of his new family. She testified that, as of the time of trial, Morris was "a miserable human being."

A close friend of Morris and his wife testified that since Texas Mutual had disputed his claim, Morris had been "keyed up, tense, not happy." She said he is "not the same person." "[H]e used to be more fun-loving and easygoing and happy all the time and always felt good." Now, "[h]e's not happy" and "[s]omething has just totally broke[n] him down."

The foregoing evidence is legally sufficient to support the jury's award for mental-anguish damages. This testimony is similar to the evidence presented in *Bentley v. Bunton*, in which the Supreme Court of Texas found sufficient evidence to support an award of mental-anguish damages. 94 S.W.3d 561, 575–76, 604 (Tex.2002). In *Bentley*, a district court judge sued a number of people connected with a public-access television show hosted by Bunton. Bunton repeatedly accused Bentley of being corrupt, and, in fact, accused Bentley of being the most corrupt public official in the area. Bunton mentioned specific proof he had of Bentley's corruption, and on one occasion he accused Bentley of acting criminally. *Id.* at 568–71. The *Bentley* court explained:

> The record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements. Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. The experience, he said, was the worst of his life. Friends testified that he had been depressed, that his honor and integrity had been impugned, that his family had suffered, too, adding to his own distress, and that he would never be the same. Much of

Bentley's anxiety was caused by Bunton's relentlessness in accusing him of corruption.

*Id.* at 606–07. Like Bentley, Morris presented some evidence that he suffered a high degree of mental anguish that substantially intruded into his daily routine.[33]

Texas Mutual claims that we cannot consider any evidence of vexation or worry caused by the staph infection, and specifically, that we cannot consider Morris's testimony that he lost thirty pounds while being fed intravenously. Texas Mutual, citing *Aranda v. Insurance Co. of North America*, 748 S.W.2d at 214, further argues that any testimony that Morris endured physical pain, suffered physical limitations because of his back, and could have died from the post-operative infection is irrelevant to mental-anguish damages, because these problems are directly related to his workplace injury. We need not reach this issue because we have considered none of this testimony in assessing the sufficiency of the mental-anguish evidence. We have considered only testimony relating to the impact on Morris's life of Texas Mutual's refusal to pay the medical bills. Thus, when we considered the staph infection, we considered only Morris's testimony that he was afraid it might not get treated and his constant worry while on intravenous medication as to how he would be able to pay for the medication. Morris's fear that he might not recover from the infection is not factored into our conclusion.

Texas Mutual also urges this court not to consider the bills that providers sent because Morris knew that his healthcare providers were not supposed to send him any bills. Yet, he received them still. And, one or more providers stated they would refer the unpaid bills to credit bureaus. But more than this, the amount of the bills themselves contributed to Morris's fears and worry. At trial, he reviewed only some of the bills, which totaled $12,431. His great concern that he would not be able to pay the medical bills contributed to his mental anguish.

Finally, Texas Mutual points out that Morris did not seek treatment for any mental or emotional problem, and that he represented to doctors on health questionnaires that he had no mental or emotional problems. Texas Mutual has not cited and we have not found any case in which a court has held that mental anguish is unproved if a claimant fails to show a complaint to or treatment by a doctor for a mental or emotional problem. More importantly, this same sort of testimony was noticeably absent in *Bentley*, the case in which the Supreme Court of Texas found the testimony sufficient to support mental-anguish damages. But, to respond directly to Texas Mutual's claim, the records in both *Bentley* and this case contain evidence of emotional and mental toll that is apparent without supporting testimony by a doctor. Among other evidence in *Bentley*, the record contained testimony that

---

33. *See id.; see also Colonial County Mut. Ins. Co. v. Valdez*, 30 S.W.3d 514, 526 (Tex.App.-Corpus Christi 2000, no pet.) (holding that evidence was sufficient to support $20,000 mental-anguish award where plaintiff felt deceived, "very mad," and powerless, and suffered high blood pressure and sleeping disorders); *Tex. Animal Health Comm'n v. Garza*, 27 S.W.3d 54, 62–63 (Tex.App.-San Antonio 2000, pet. denied) (holding that evidence of mental anguish was sufficient where plaintiff

"had changed," was "irritable, depressed, and under tremendous stress," had physical symptoms, and felt like "less of a man" because he was not providing for his family); *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 395 (Tex.App.-Dallas 2000, pet. denied) (holding evidence of mental anguish sufficient where plaintiff "felt devastated," could not sleep, and "reduced dramatically her participation in church activities").

Bentley was "sad" or "downcast" and would never be the same as he used to be. *See Bentley,* 94 S.W.3d at 576–77. Similarly, our record contains testimony that Morris was "a miserable human being," that he was "not happy," that he felt "worthless," and that "[s]omething has just totally broke[n] him down." Thus, although in neither case did the claimant seek the help of a doctor, in both cases the claimants paid an emotional or mental price and their countenances revealed the price paid. Further, in a subsequent opinion, the Supreme Court of Texas held that the evidence of mental anguish previously found to be legally sufficient supported a mental-anguish award of $150,000. *See Bunton v. Bentley,* 153 S.W.3d 50, 52–53 (Tex.2004).

Under the applicable standard of review, we conclude that the record contains legally sufficient evidence to support the award for mental-anguish damages. Accordingly, we overrule Texas Mutual's fourth issue.

## D. Insufficiency of Evidence of Damages to Credit Reputation

The jury awarded Morris $75,000 for loss of credit reputation, comprised of $25,000 for past damages and $50,000 for future damages. In its third issue, Texas Mutual contends that the evidence supporting these damages is legally insufficient.

■■■ Texas allows awards for damage to credit reputation. In *St. Paul Surplus Lines Insurance Co. v. Dal–Worth Tank Co.,* the Supreme Court of Texas explained, "[t]o prove that credit rating is harmed is to prove nominal damages; not until a loan is actually denied or a higher

interest rate charged is there proof of actual damages." 974 S.W.2d 51, 53 (Tex. 1998). But even more importantly, the high court added this language in explaining the precise proof necessary to show actual damage: "There must be a showing that such inability *resulted in injury* and *proof of the amount of injury.*" *Id.* (emphasis added). Thus, in *Dal–Worth Tank,* the court held that no evidence of damage to credit reputation existed because there was no evidence of a real injury and no evidence of any specific increase in the claimant's cost of doing business. *Id.* For example, before its credit reputation was allegedly damaged, Dal–Worth Tank had a large line of credit that was greatly diminished, but Dal–Worth Tank introduced no evidence that the decline injured it in any way because it did not need to use the line of credit. *Id.* Likewise, in *Castañeda,* the plaintiff testified that she "had applied for credit cards and was turned down." *Castañeda,* 988 S.W.2d at 199. The Supreme Court of Texas concluded that this evidence was legally insufficient,[34] reiterating that "there must be a showing that the inability to obtain a loan resulted in injury and proof of the amount of that injury.'" *Id.* (quoting *Dal–Worth Tank Co.,* 974 S.W.2d at 53).

■■■ Loss to credit reputation is a form of economic, or financial, damage. For this reason, it makes sense to require more precision in the proof of damage. That, it seems, is the reasoning behind *Dal–Worth Tank Co.* and *Castañeda.* We understand both of those decisions to instruct that a claimant cannot recover for damage to credit reputation unless he shows that he suffered identifiable, meas-

---

34. The opinion is unclear whether the court meant that denial of a credit-card application does not qualify as a denial of a loan or whether Castañeda failed to prove exactly how she was injured by being turned down for credit cards. *Id.* However, the important point is that a plaintiff must have identifiable, measurable damages that are shown to the jury. *Id.*

urable damages. *Castañeda,* 988 S.W.2d at 199; *Dal–Worth Tank Co.,* 974 S.W.2d at 54. Testing Morris's proof against this standard, we cannot affirm the award.

Like the plaintiffs in *Dal–Worth Tank Co.* and *Castañeda,* Morris failed to prove any amount of injury. Morris testified that he prided himself on having a sterling credit reputation. After Texas Mutual's actions, his credit rating "definitely went down" and he was unable to finance a new washing machine because of his poor credit rating. He also testified that he was unable to secure a mortgage on his home, which had to be financed solely in his wife's name. At no point, however, did Morris, or anyone else, such as an expert, define the injury Morris sustained when he could not take out a loan on a washing machine. In addition, neither Morris, nor any witness in his behalf, put a dollar amount on the injury he claimed to have sustained because of his inability to obtain the washing-machine loan or to have his name on his home mortgage. In short, Morris proved no identifiable, measurable damages. *See Tex. Mut. Ins. Co. v. Ruttiger,* 265 S.W.3d 651, 672–73 (Tex.App.-Houston [1st Dist.] 2008, pet. filed). For these reasons, we hold that the evidence is legally insufficient to support an award for damage to credit reputation.

We sustain Texas Mutual's third issue and modify that portion of the judgment to omit the damages for credit reputation and to award actual damages in the amount of $50,000, representing the jury's award of mental-anguish damages only.

As a consequence of reducing the award of actual damages, we also modify that portion of the judgment awarding additional damages consistent with section 541.152, which permits the trier of fact, upon a finding that the defendant acted knowingly, to award an amount not to exceed three times the amount of actual damages. *See* TEX. INS.CODE ANN. § 541.152 (Vernon 2009). Therefore, as discussed more fully below, we also modify that portion of the judgment to award additional damages of $100,000, two times the actual damages after reduction on appeal.

As a further consequence of these modifications, because we are reducing the damages awarded, we also reverse the award of attorney's fees and remand for a new trial on that issue.[35] The reduction in the actual and additional damages awarded results in a total award of $150,000, less than twenty-five percent of the jury's total award. Therefore, we reverse that portion of the judgment awarding attorney's fees and remand that issue for a new trial.

### E.  Jury Instructions

In its fifth issue, Texas Mutual contends that the trial court erred in instructing the jury in Question 2 on "eight different theories of liability." Texas Mutual asserts that, assuming the record contains evidence to support one or more of these theories, there is not legally sufficient evidence to support all the submitted theories. Therefore, according to Texas Mutual, the trial court erroneously submitted a jury question containing both valid and invalid theories of liability in contra-

---

35.  *See Barker v. Eckman,* 213 S.W.3d 306, 313–15 (Tex.2006) (holding that, when appellate court reduces damages award, attorney's fee award should be reversed and case remanded for new trial on that issue unless the appellate court is reasonably certain that jury was not significantly influenced by the erroneous amount of damages it considered); *re-*Pipe, *Inc. v. Turpin,* 275 S.W.3d 39, 51 (Tex. App.-Houston [14th Dist.] 2008, no pet.) (reversing award of trial and appellate attorney's fees and remanding case for new trial when court could not be reasonably certain that jury was not significantly influenced by erroneous damage amounts it considered).

vention of *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d at 388 (holding it was error to submit a broad-form liability question incorporating both valid and invalid theories of liability). Under *Casteel,* when the jury charge is drafted such that the jury may have based its finding of liability "solely on one or more ... erroneously submitted theories .... it is impossible for us to conclude that the jury's answer was not based on one of the improperly submitted theories." *Id.* at 389. "However, when questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory, the error may be harmless." *Id.* (citing *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial") and *Boatland of Houston, Inc., v. Bailey,* 609 S.W.2d 743, 749–50 (Tex.1980) (holding that the potentially improper submission of defensive issues was harmless error when the jury also found for the defendant on independent grounds)). Thus, reversal is not required when an appellate court may be "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Romero v. KPH Consolidation, Inc.,* 166 S.W.3d 212, 227–28 (Tex.2005) (quoting *Braun v. Flynt,* 731 F.2d 1205, 1206 (5th Cir.1984)).

■ On appeal, the parties dispute whether Question 2 included two or eight theories of liability. However, for the purposes of our review, we need not decide this issue because, however it is viewed, we are reasonably certain that the jury answered "yes" to one of two specific sub-parts of Question 2, both of which are supported by legally sufficient evidence. For this reason, we need not look further.

In the first question, the jury was asked to decide if Texas Mutual breached its duty of good faith and fair dealing in one of two ways:

(1) denying a claim when it knew or should have known that it was reasonably clear that the claim was covered, or

(2) failing to reasonably investigate a covered claim.

The jury answered "yes" to this question, finding that Texas Mutual violated one or both of these duties.

Next, Question 2 required the jury to decide if Texas Mutual engaged in various unfair or deceptive acts or practices, which were subdivided into unfair settlement practices and misrepresentations. Two of the acts or practices listed under unfair settlement practices are almost verbatim the two acts the jury was asked to consider in Question 1. Question 2 listed the acts this way:

b. failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become clear; or

...

d. refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

It is extremely unlikely that the jury, having just considered essentially these same two items in Question 1, and having decided that Texas Mutual engaged in one or both of them, would arrive at Question 2 and fail to recognize that sub-parts "b" and "d" listed above were the same items listed in Question 1. And, it is equally unlikely that the jury, having answered one or both of these inquiries affirmatively in Question 1, would not give the same answer in Question 2. Thus, if the jury found both "reasonably clear liability" and "no reasonable investigation" in response to Question 1, we are reasonably certain that the jury

made these same findings in response to Question 2. Likewise, if the jury found in responding to Question 1 that Texas Mutual engaged in only one of these two practices, we are reasonably certain that the jury would make the same finding in responding to Question 2. In section III. A. above, we have found that legally sufficient evidence supports both of these findings. The same evidence supports a "yes" answer in both Question 1 and Question 2.

The jury also may have found other unfair acts were committed, but we need not consider whether any of the other six acts listed in Question 2 were submitted erroneously or whether the jury found that any of the other six acts were committed. This exercise is unnecessary given the determination that sufficient evidence supports findings as to both items listed in Question 1 and that sufficient evidence supports findings as to the same two items in Question 2. And, we are reasonably certain that whatever finding the jury made in response to Question 1, it made the same finding in response to Question 2. For this reason, we find no *Casteel* error requiring reversal. *See Romero*, 166 S.W.3d at 227–28; *see also Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 434 (Tex. 2005) (explaining that "[u]nder broad-form submission rules, jurors need not agree on every detail of what occurred so long as they agree on the legally relevant result"). Accordingly, we overrule Texas Mutual's fifth issue.[36]

### IV.  ANALYSIS OF CLAIMANT'S CROSS-APPEAL

The jury awarded Morris, among other things, additional damages of $500,000 because it found that Texas Mutual acted knowingly. Morris moved for the trial court to enter judgment on the jury's verdict, but asked the trial court to reduce the jury's award of additional damages to $375,000, to reflect an amount that was three times the actual damages of $125,000 the jury awarded Morris. Morris argued that section 541.152 authorizes the recovery of actual damages *plus* three times the amount of actual damages, for a total of four times the amount of actual damages. Texas Mutual filed a motion to disregard the jury verdict and for judgment notwithstanding the verdict ("JNOV"), arguing, among other things, that quadrupling the actual damages is not authorized by the statute and is contrary to judicial precedent. The trial court agreed with Texas Mutual and, in its judgment, awarded Morris $250,000 in additional damages, a sum that is two times the amount of actual damages awarded.

■ In one issue, Morris contends that, when construed according to the rules of grammar and common usage, the language of section 541.152(b) permits a plaintiff to recover statutory damages of three times the amount of actual damages, in addition to actual damages, for a knowing violation of the Texas Insurance Code. Statutory construction is a question of law, which we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006).

Section 541.152, entitled "Damages, Attorney's Fees and Other Relief," provides as follows:

---

36. Texas Mutual predicates its sixth issue on this court reviewing whether the trial court's judgment may be affirmed based on Texas Mutual's liability under the common-law bad-faith claim, rather than the claim under the Texas Insurance Code. This court affirms Texas Mutual's liability under Morris's Insur-
ance Code claim and does not review whether the trial court's judgment may be affirmed based on Texas Mutual's liability under Morris's common-law bad-faith claim. Accordingly, we need not and do not address Texas Mutual's sixth issue.

(a) A plaintiff who prevails in an action under this subchapter may obtain:

   (1) the amount of actual damages, plus court costs and reasonable and necessary attorney's fees;

   (2) an order enjoining the act or failure to act complained of; or

   (3) any other relief the court determines is proper.

(b) On a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages.

Tex. Ins.Code Ann. § 541.152(a)-(b) (Vernon 2009).

Morris argues that, because subsection (b) is separate from subsection (a), which provides for actual damages, costs and attorney's fees, it evinces the legislature's intent to allow the recovery of additional damages for a knowing violation in addition to actual damages. Morris also argues that the absence of disjunctive language between subsections (a) and (b) indicates that "the claimant may independently invoke the remedies contained" in these two subsections. Morris contends that given the structure of the current statute, it cannot be analogized to prior versions contained in former Insurance Code article 21.21, which have been construed, contrary to Morris's proposed construction, to limit a plaintiff's recovery to three times the amount of actual damages, rather than actual damages plus three times actual damages.[37]

In essence, Morris argues that this court should read the words "in addition" into section 541.152 between subsections (a) and (b). Construing the statute in this fashion not only would run afoul of the plain meaning of the statutory language but also would contravene the history of the damages provision.

In the 1985 version of the Insurance Code, article 21.21, section 16(b) provided as follows:

(b) In a suit filed under this section, any plaintiff who prevails may obtain:

(1) the amount of actual damages plus court costs and reasonable and necessary attorneys' fees. If the trier of fact finds that the defendant knowingly committed the acts complained of, the court shall award, in addition, two times the amount of actual damages; or

(2) an order enjoining such acts or failure to act; or

(3) any other relief which the court deems proper.

Act of Mar. 19, 1985, 69th Leg., R.S., ch. 22, § 3, 1985 Tex. Gen. Laws 395 (repealed). In 1995, section 16(b) was amended to change the reference to an additional two times actual damages to "not more than three times the amount of actual damages":

In a suit filed under this section, any plaintiff who prevails may obtain ... the amount of actual damages plus court costs and reasonable and necessary attorneys' fees. *If the trier of fact finds that the defendant knowingly committed the acts complained of, the trier of fact may award not more than three times the amount of actual damages ....*

---

**37.** *See Allstate Indem. Co. v. Hyman,* No. 06–05–00064–CV, 2006 WL 694014, at *10–12 (Tex.App.-Texarkana Mar. 21, 2006) (mem. op.) (holding that former article 21.21 limits a plaintiff's total recovery to three times actual damages), *judm't vacated by agr.,* 2006 WL 1229089 (Tex.App.-Texarkana May 9, 2006); *Liberty Mut. Fire Ins. Co. v. McDonough,* 734 S.W.2d 66, 71 (Tex.App.-El Paso 1987, no writ) (holding that treble damages are calculated by making the total award three times the actual damages found by the jury).

Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 13, 1995 Tex. Gen. Laws 2988, 3000 (repealed 2003) (formerly Tex. Ins.Code art. 21.21, § 16(b)(1)) (emphasis added). The current section 541.152, enacted in 2003, simply places language substantively identical to the emphasized language in a separate subsection (b). We cannot say that by taking that action, the legislature intended to significantly increase the upper limit of the relief available for a knowing violation of the Insurance Code. Indeed, the legislature made clear that the 2003 amendments were intended merely to recodify the existing law without substantive change. *See* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 27, 2003 Tex. Gen. Laws 3611, 4139 ("This Act is intended as a recodification only, and no substantive change in law is intended by this Act."). Further, if the legislature intended that the remedy available in subsection (b) was "in addition" to that provided in subsection (a), it could have used those words, as it did in the 1985 version, in which it expressly stated that two times actual damages were available "in addition" to the actual damages found when the trier of fact finds that the defendant acted knowingly. But, the legislature did not use those words; it merely separated the sentences into different sections. Thus, we do not construe the statute to provide that, in addition to actual damages, three times the amount of actual damages may be awarded for a knowing violation. For the same reason, we do not view the absence of the disjunctive "or" between the sections as indicating that the legislature intended to increase the damages available for a knowing violation. Therefore, we reject Morris's statutory-construction argument grounded on the legislature's placement of the available remedies into separate sections.

■ Morris also argues that his construction of section 541.152 is consistent with the legislature's modification of the DTPA damages provision to provide that a claimant may recover economic damages and, in addition, three times the amount of economic damages if the defendant's conduct was knowing. Section 17.50(b)(1) of the DTPA, on which Morris relies, provides as follows:

> (b) In a suit filed under this section, each consumer who prevails may obtain:
>
> (1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages....

Tex. Bus. & Com.Code Ann. § 17.50(b)(1) (Vernon 2002). Morris argues that the Supreme Court of Texas has confirmed his interpretation of this language in *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex.2006), and therefore the same reasoning should apply to the Texas Insurance Code. Morris relies on the following statements from *Chapa:*

● "For a DTPA violation, [the plaintiff] could recover economic damages, mental anguish, and attorney's fees, but not additional damages *beyond* $21,639 (three times her economic damages)." *Id.* at 304 (emphasis added).

● "For acts committed intentionally, a consumer may recover additional damages up to three times the amount

of economic and mental anguish damages combined...." *Id.* at 304 n. 6.

- "Under either fraud or the DTPA, Chapa is entitled to $7,213 in economic damages and $21,639, in mental anguish.... At the trial level, the most Chapa could recover under the DTPA would be additional damages of $21,639 (three times her economic damages) plus attorney's fees of something less than $20,000 (depending on the new verdict). If the court of appeals' reassessment of exemplary damages for fraud exceeds this amount, Chapa would obviously be better off electing that recovery...." *Id.* at 314–15.

These statements from *Chapa,* however, were not necessary to the decision in the case; nor do they appear to have been made deliberately and for future guidance in the conduct of litigation. *See id.* at 304, 314–15. Therefore, we conclude that these statements are obiter dicta. *See Edwards v. Kaye,* 9 S.W.3d 310, 314 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Additionally, the *Chapa* language Morris cites does not apply because in *Chapa* the high court was discussing section 17.50(b)(1) of the DTPA, not section 541.152(b) of the Texas Insurance Code. The DTPA provision is not analogous because it provides for both economic and additional damages within a single subsection, contrary to the separate subsections in the Texas Insurance Code provision that are central to the argument Morris advances. Had the legislature intended the two provisions to be construed similarly, it could have drafted these provisions similarly, but it did not. Further, the language is somewhat different, expressly providing that a consumer, in addition to economic damages, *"may also recover* damages for mental anguish ... and the trier of fact may award not more than *three times the amount of economic dam-*

*ages.* ..." The inclusion of the "may also recover" language, which does not appear in section 541.152(b) of the Texas Insurance Code, indicates that additional damages are authorized for a knowing violation of the DTPA, and so appears more favorable to a plaintiff than the language in section 541.152(b). Had similar language been included in section 541.152(b), or had the statute contained the language Morris contends should be read into it—that the trier of fact may award three times the amount of actual damages "in addition" to the award of actual damages—our conclusion might be different.

Finally, we note that Morris cites no case law to support the notion that a plaintiff may obtain additional damages of three times the amount of actual damages under section 541.142(b), and we have found none. Therefore, based on the plain language of the provision, statutory history, and prior precedent, we decline to adopt Morris's interpretation of section 541.142(b).

We overrule Morris's sole issue in his cross-appeal.

## V. CONCLUSION

Having considered the issues raised in Texas Mutual's appeal and Morris's cross-appeal, as well as Texas Mutual's motion for rehearing, we conclude there is no evidence to support that portion of the judgment awarding Morris damages for loss of credit reputation in the past and in the future. We therefore modify the judgment to omit the damage awards for loss of credit reputation, and instead to reflect an award of actual damages in the amount of $50,000. We further modify the judgment to reflect an award of additional damages in the amount of $100,000. We reverse that portion of the judgment awarding attorney's fees and remand for a

new trial of that issue and also for recalculation of pre-judgment and post-judgment interest. We affirm the remainder of the trial court's judgment.